Filed 2/8/23  L.A. Unified School Dist. v. FH Paschen/S.N. Nielsen CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LOS ANGELES UNIFIED SCHOOL DISTRICT,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>FH PASCHEN/S.N. NIELSEN, INC., et al.,<br><br>    Defendants and Appellants. | B300332<br><br>Los Angeles County Super. Ct. Nos. BC579782 & BC485294 |

APPEALS from a judgment of the Superior Court of Los Angeles County, Richard L. Fruin and Victor E. Chavez, Judges. Reversed and remanded with directions.

Orbach Huff Suarez & Henderson, David M. Huff, Kelly Houle-Sandoval; Mark A. Miller for Plaintiff and Appellant Los Angeles Unified School District.

Pine Tillett Pine, Norman Pine, Scott Tillett; Troutman Pepper Hamilton Sanders, Marion T. Hack, and Erica R. Graves for Defendants and Appellants FH Paschen/S.N. Nielsen, Inc.,

Continental Casualty Company, and Safeco Insurance Company of America.

Watt, Tieder, Hoffar & Fitzgerald, Robert C. Niesley, and Robert C. Shaia for The Surety & Fidelity Association of America as Amicus Curiae on behalf of Defendants and Appellants Continental Casualty Company and Safeco Insurance Company of America.

_____

## INTRODUCTION

It has been said throughout this litigation that estimating the cost of a construction project is not an exact science. The dispute at hand relates to estimated project costs submitted by FH Paschen/S.N. Nielsen, Inc., (Contractor) to the Los Angeles Unified School District (the District) which formed the basis of agreements to renovate cafeterias at 30 schools as part of the District's Café LA program. The District and Contractor entered into eight contracts (master job order contracts) which set most of the terms and conditions of the work to be provided by Contractor. When the District required work at a school site, it requested a job order proposal, i.e., an estimate of the cost to complete the project, from Contractor. Those job order proposals disclosed every detail of the estimate—the items to be used, the per item cost, the quantities proposed, and the mark-up to be applied.

Because the individual projects were not competitively bid, Contractor was required to use pricing formulas contained in the master job order contracts when it prepared its job order proposals. In addition, the prices the District would pay for construction tasks were generally fixed by a catalog published by

2

the District. And the District was required to obtain an independent estimate for each project before deciding whether to accept Contractor's job order proposals. Armed with all this information, the District exercised its discretion to enter into 74 firm, fixed-price, lump sum job orders with Contractor, divided into three phases of work. Contractor fully performed each of the job orders and the District was satisfied with Contractor's work. It later described Contractor's work on the projects as "an excellent and transformative success."

Years after the projects were completed, however, the District audited the job order contracting program generally and Contractor's work on the Café LA projects in particular.[1] One audit found, among other things, that the District's staff had misused the job order process to order equipment and materials (as it did in the first two phases of work at issue here) and failed to administer the job order contract program properly. Another audit concluded that Contractor had "overpriced" numerous job orders, i.e., had failed to properly apply the pricing formulas contained in the master job order contracts when it prepared its job order proposals. This extensive litigation ensued.

The District sued Contractor and its sureties, Continental Casualty Company (Continental) and Safeco Insurance Company of America (Safeco) (collectively, Sureties), for breach of the master job order contracts. The case was resolved in a series of proceedings—a bench trial, motions for summary adjudication, piecemeal rulings on damages and prejudgment interest, and,

---

[1] Other Café LA contractors were also audited. (See, e.g., *Los Angeles Unified School Dist. v. Torres Construction Corp.* (2020) 57 Cal.App.5th 480 (*Torres*).)

3

finally, a jury trial on the remaining unresolved claims. In total, the District was awarded damages and interest in excess of $5 million.

As we will explain, the court's findings that Contractor failed to properly apply the pricing formulas contained in the master job order contracts in its job order proposals for Phases I and II are sound, but the awards of damages and prejudgment interest are not, and so we will remand for further proceedings. We also agree with the court's determination that Sureties are liable to the same degree as Contractor pursuant to the bonds they issued. Finally, we conclude that the District's theory of liability in the Phase III jury trial is not supported by the applicable contractual and statutory provisions and therefore Contractor and Sureties are entitled to judgment in their favor as a matter of law on those claims.[2]

## BACKGROUND: JOB ORDER CONTRACTING

"Public works contracts are a unique species of commercial dealings." (*Roy Allan Slurry Seal, Inc. v. American Asphalt South, Inc.* (2017) 2 Cal.5th 505, 510.) The Public Contract Code contains a host of statutes governing the procurement of construction contracts by public entities and they generally require competitive bidding and the award of the contract to the lowest responsible bidder. (See *Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 313 ["In California, competitive bidding is largely

---

[2] Because we conclude that the verdict against Contractor and in favor of the District for the Phase III job orders must be reversed, the District's cross-appeal from the judgment in favor of Sureties with regard to Phase III is moot.

4

governed by statute."]; Pub. Contract Code, §§ 20162 [city contracts], 20128 [county contracts], 10180 [state contracts]; 9 Miller & Starr, Cal. Real Estate (4th ed. 2022) § 31:26 ["In most instances, a public agency is required by law to procure contracts for public works pursuant to competitive bidding statutes that require the award of the contract to the lowest responsible bidder."].) "[B]idding requirements must be strictly adhered to in order to avoid the potential for abuse in the competitive bidding process. [Citation.]" (*Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 175–176 (*Domar Electric*).)

" 'Statutes and ordinances that authorize or require competitive bidding in the letting of public contracts ordinarily serve the purpose " 'of inviting competition, to guard against favoritism, improvidence, extravagance, fraud and corruption, and to secure the best work or supplies at the lowest price practicable.' " Such measures "are enacted for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders, and should be so construed and administered as to accomplish such purpose fairly and reasonably with sole reference to the public interest. These provisions are strictly construed by the courts, and will not be extended beyond their reasonable purpose." ' [Citation.]" (*Hensel Phelps Construction Co. v. Department of Corrections & Rehabilitation* (2020) 45 Cal.App.5th 679, 691 (*Hensel Phelps*); accord *Domar Electric, supra,* 9 Cal.4th at p. 173 [same]; Pub. Contract Code § 100, subds. (b)–(d) [noting that by enacting the Public Contract Code, the Legislature intended to "ensure full compliance with competitive bidding statutes as a means of protecting the public from misuse of public funds," "provide all qualified bidders with a fair opportunity to enter the bidding process, thereby stimulating

competition in a manner conducive to sound fiscal practices," and "eliminate favoritism, fraud, and corruption in the awarding of public contracts"].)

In 2003, California adopted an alternative construction procurement procedure for the District called job order contracting. (Assem. Bill No. 14 (2003–2004 Reg. Sess.) § 1, codified at former[3] Pub. Contract Code[4] §§ 20919–20919.15.) Generally, "[a] *job order contract* is a competitively-bid contract for performance of minor construction, renovation, alteration, painting and repair work, and typically involves a variety of tasks such as roofing, electrical, and plumbing renovation and repair. The agreement is based on a unit price book which sets forth detailed pricing of various tasks, and a contractor's bid is usually expressed in terms of a percentage of the specified charges, such as 115 or 125%." (Acreta & Perrochet, Cal. Constr. L. Manual (2021–2022) § 7:32, pp. 1145–1146.)[5]

The District used job order contracting to implement the Café LA program. The job order contracting procedure allowed the District to retain multiple contractors to undertake a variety

---

[3] The code sections at issue have been repealed and recodified at Public Contract Code section 20919.20 et seq. (See Stats. 2015, ch. 753, §§ 1 and 2, both operative as of Jan. 1, 2016.)

[4] All undesignated statutory references are to the former Public Contract Code, as it existed prior to January 1, 2016.

[5] Section 20919.1, subdivision (e) provides, " 'Job order contract' means a competitively bid contract between the [District] and a licensed, bonded, and general liability insured contractor in which the contractor agrees to a fixed period, fixed unit price, and indefinite quantity contract that provides for the use of job orders for public works or maintenance projects."

of tasks in accordance with pre-set prices and pricing formulas.[6] After entering into a master job order contract with a contractor, the District would issue project-specific job orders, directing the contractor to perform a detailed scope of work for a firm, fixed price, lump sum.[7] That fixed price would be proposed by the contractor in a job order proposal and would be calculated using pre-priced construction tasks and the formulas provided by statute and the contract documents.[8] The District could then accept, reject, or ask the contractor to modify the proposal.[9]

---

[6] Section 20919.4, subdivision (b)(1) allows the District to award multiple job order contracts.

[7] Section 20919.1, subdivision (d) provides, " 'Job order' means a firm, fixed price, lump-sum order issued by the [District] to a job order contractor for a definite project scope of work as compiled from the catalog of construction tasks to be performed pursuant to a job order contract. No single job order may exceed one million dollars ($1,000,000) in value."

[8] Section 20919.1, subdivision (*l*) provides, " 'Proposal' means the job order contractor prepared documents quoting those construction tasks listed in the catalog of construction tasks that the job order contractor requires to complete the project scope of work, together with the appropriate quantities of each task. The pricing of each task shall be accomplished by multiplying the construction task unit price by the proposed quantity and the contractor's competitively bid adjustment factor. The proposal shall also contain a schedule for the completion of a specific project scope of work as requested by the [District.] The proposal may also contain approved drawings, work schedule, permits, or other documentation as the [District] may require for a specific job order."

[9] The District was not required to accept the contractor's job order proposal: "In the event that the contractor's proposal for a given job order is found to be unreasonable, not cost effective, or undesirable, the

As may be apparent, job order contracting has some inherent risks. Unlike traditional competitive bidding in which the public entity must award the contract to the lowest qualified bidder, in job order contracting the public entity exercises its discretion to determine whether to accept a contractor's job order proposal, which is not competitively bid. To counteract the risks attendant to that exercise of discretion by the District, the Legislature included several safeguards in the job order contracting statutory scheme. First, as noted, the unit prices for construction work are fixed by the District in a construction task catalog.[10] Second, the contractor is required to develop the proposed job order price using items from the construction task catalog and applying the pricing formulas contained in the statute and the contract documents.[11] Third, the contractor's job order price proposal is transparent: it lists every task the contractor projects may be required for the work, the applicable unit price from the construction task catalog, and its competitively bid adjustment factor. In other words, the contractor not only estimates the price for a detailed scope of work but also discloses to the District how it formulated its estimate. Fourth, the District obtains an independent estimate for each job order and compares that estimate to the contractor's proposed job order price to help determine whether the

---

[District] is under no obligation to issue the job order to the job order contractor, and may instead utilize any other available procurement procedure." (§ 20919.11, subd. (a).)

[10] We may refer to the construction task catalog occasionally as the catalog or the CTC.

[11] Section 20919.1, subdivision (*l*).

contractor's price is reasonable.[12] Fifth, and finally, all job orders are reviewed and approved by at least two levels of District management.[13] With these safeguards in place, the District should be well-positioned to evaluate the reasonableness of a contractor's job order proposal.

Importantly, both the competitive bidding and job order contracting processes lead to the same result—a firm, fixed-price, lump sum contract in which the contractor is obligated to perform a detailed scope of work for the agreed-upon price.[14]

## FACTS AND PROCEDURAL BACKGROUND

### 1.   The Café LA Project

The District implemented a program called Café LA designed to modernize cafeterias at 64 high schools and middle schools. The District elected to use the job order contracting process for this work and, as pertinent here, awarded eight

---

[12] Section 20919.11 provides, in pertinent part, "In order to prevent fraud, waste, and abuse, the [District] adopting job order contracting shall … :[¶] (a) Prepare for each individual job order developed under a job order contract an independent [District] estimate. The estimate will be prepared prior to the receipt of the contractor's offer to perform work [i.e., the job order proposal] and will be compared to the contractor's proposed price to determine the reasonableness of that price before issuance of any job order."

[13] Section 20919.11, subdivision (b) provides, "The [District] may not issue a job order until the job order has been reviewed and approved by at least two levels of management."

[14] Section 20919.1, subdivision (d), defines "job order," in pertinent part, as "a firm, fixed price, lump-sum order issued by the [District] … for a definite project scope of work … ."

9

master job order contracts to Contractor.[15] Each of those contracts included Contractor's competitively bid adjustment factor. The job order contracts also incorporated a construction task catalog[16] and a set of General Conditions[17] setting forth many of the terms and conditions applicable to Contractor's work for the District.[18] As pertinent here, the General Conditions included two formulas to be used by Contractor in pricing its

---

[15] The contracts are designated as follows: (i) Contract No. 0530003 signed on or about April 6, 2005; (ii) Contract No. 0530014 signed on or about July 19, 2005; (iii) Contract No. 0530017 signed on or about July 14, 2005; (iv) Contract No. 0530020 signed on or about July 19, 2005; (v) Contract No. 0630021 signed on or about July 19, 2006; (vi) Contract No. 0630028 signed on or about July 19, 2006; (vii) Contract No. 0830022 signed on or about February 6, 2008; and (viii) Contract No. 0830030 signed on or about September 16, 2008.

[16] The construction task catalog is a lengthy document that lists a wide variety of frequently used construction tasks and the fixed price the District will pay for those tasks.

[17] The District's job order contracting process is governed under both statutes and contract documents, including the General Conditions. If any conflict arises between these two governing schemes, the statute controls over the General Conditions.

[18] The early job order contracts incorporate the District's 2005 General Conditions and the later ones incorporate the 2007 General Conditions. We will note material differences between the two versions as necessary. All citations to "Art." refer to the Articles of the General Conditions.

project-specific job order proposals: the CTC pricing formula[19] and the NPP pricing formula[20].[21]

The District entered into 74 job orders with Contractor covering three phases of work. In Phase I, the District directed Contractor to obtain kitchen equipment for 30 schools. In Phase II, the District directed Contractor to obtain additional kitchen equipment for 30 schools. And in Phase III, the District directed Contractor to perform electrical work and install the previously obtained kitchen equipment at 14 schools.

---

[19] For line items found in the construction catalog, the following formula (CTC pricing formula) applies: "Prepriced Work requirements will identify the type and number of Work units required from the CTC. The price per unit set forth in the CTC shall serve as the base price for purpose of the operation of this provision. The Proposal price shall be the sum of the cost of each applicable CTC task, which is calculated according to the following formula: [¶] A= Number of Units Required for CTC Task [¶] B= Applicable Adjustment Factor [¶] C= CTC Price per Unit [¶] Cost of CTC task [¶] A x B x C[.]" (Art. 6.61.3.4.1 (2005).) The 2007 General Conditions include the same formula. (Art. 6.28.4.1.)

[20] For non-prepriced items, i.e., items not found in the construction task catalog, the formula (NPP pricing formula) has seven factors. As pertinent here, the NPP pricing formula is the subcontractor cost to Contractor plus either five percent of the subcontractor cost (Art. 6.61.3.4.3.4 (2005)) or 15 percent of the subcontractor cost (Art. 6.28.4.2 (2007).)

[21] As required, Contractor obtained performance bonds from Sureties. The bonds are numbered, respectively, (i) 929357019/6327968, (ii) 929357032/6327987, (iii) 929367735/6328023, (iv) 929367736/6328024 (v) 929400409/6384251, (vi) 929400408/6384250, (vii) 929445812/6494368, and (viii) 929460287/6577070. The first number is from Continental and the second is from Safeco.

The District was satisfied with Contractor's work. For purposes of the bench trial, for example, the District stipulated as follows: "The District admits for the purposes of this trial that [Contractor] performed the work of the detailed scope of work to the satisfaction of the District's authorized representatives and inspectors. The District admits that the cafeteria revitalization work at Burroughs and Birmingham resulted in an excellent and transformative success for providing food services for the District's students attending those schools. ..."

The District's Office of Inspector General audited the job order contracting program and concluded, among other things, that District staff had misused the job order process to order equipment and materials (as it did in the first two phases of work at issue here) and failed to administer the job order contract program properly. Another audit concluded that Contractor had inflated the prices on numerous job orders in violation of the master job order contracts. This litigation ensued.

## 2. The Operative Complaints

The operative fourth amended complaint contained four causes of action. The first two causes of action against Contractor alleged breaches of the eight master job order contracts used to issue job orders for Contractor's work on the Café LA program. Generally, the District asserted that Contractor failed to price its job order proposals as required under the General Conditions by, for example, applying the CTC pricing formula when the NPP pricing formula was required, or by applying the NPP pricing formula using an inflated mark-up instead of the authorized five or 15 percent mark-up. More particularly, the District alleged Contractor breached the master job order contracts by "(1) failing to submit proposals using the pre-determined contractual

12

formula for non-prepriced items of work;[22] (2) proposing inappropriate quantities for items of work; (3) failing to install proposed items of work called for in its job orders; (4) charging for work never performed; (5) charging excessive and inappropriate mark-ups; and (6) failing to provide monetary credit for overpriced and inappropriately marked-up items and non-performed work."

The third cause of action against Sureties alleged that Contractor failed to comply with all of its obligations under the master job order contracts and asserted that under the terms of the performance bonds, Sureties were liable for the District's damages for breach of contract as well as the District's litigation costs and attorney's fees. The fourth cause of action, for money had and received, was subsequently dismissed.

For reasons not relevant to this appeal, the parties agreed at some point to split the action into two separate cases—the original case which would now relate only to Phases I and II[23] and a new case relating only to Phase III.[24] In April 2015, the District filed its new complaint directed only to the 14 Phase III job orders.[25] The new complaint named Contractor and Sureties

---

[22] This allegation was only asserted with respect to Phases I and II.

[23] *Los Angeles Unified School District v. FH Paschen/S.N. Nielsen, Inc., et al.* (Super. Ct. Los Angeles County, No. BC485294)

[24] *Los Angeles Unified School District v. FH Paschen/S.N. Nielsen, Inc., et al.* (Super. Ct. Los Angeles County, No. BC579782)

[25] The job order contracts and schools at issue for Phase III are #0630021: Adams Middle School, Belvedere Middle School, Berendo Middle School, Burbank Middle School, Emerson Middle School, King Middle School, Nightingale Middle School, and Virgil Middle School;

as defendants and reasserted the causes of action and theories of liability found in the operative complaint. Specifically, the first three causes of action alleged Contractor breached the master job order contracts by "(1) failing to submit proposals with Work units and quantities that were reasonable for the tasks to be performed; (2) proposing inappropriate quantities for items of work; (3) failing to install proposed items of work called for in its job orders; (4) charging for work never performed; and (5) failing to provide monetary credit for overpriced and inappropriately marked-up items and non-performed work."

The District further alleged that Contractor's "job orders and proposals also included quantities and pricing for work that [Contractor] never performed, but nevertheless billed the DISTRICT for and received payment in full. [Contractor] also over-billed the DISTRICT for certain items, and there were great variations in quantities and units between the As-Built and the A/E project drawings and specifications. The DISTRICT further found that some required materials and equipment were improperly substituted by [Contractor]. For example, [Contractor] billed the DISTRICT for copper transformers but supplied the DISTRICT with more inexpensive aluminum transformers. The DISTRICT believes that as a result of [Contractor's] job orders and proposals including quantities and pricing for work that was never performed, [Contractor] was

---

#0630028: Banning High School, Henry Middle School, Kennedy High School, Marina Del Rey Middle School, and North Hollywood High School; and #0830030: Berendo Middle School (second job order.) Contract #0830030 is governed by the 2007 General Conditions. The other contracts are governed by the 2005 General Conditions.

14

overpaid a sum in excess of the jurisdictional minimum of this Court."

The fourth cause of action against Sureties alleged that Contractor failed to comply with all of its obligations under the master job order contracts and asserted that under the terms of the performance bonds, Sureties were liable for the District's damages for breach of contract as well as the District's litigation costs and attorney's fees. The fifth cause of action, for money had and received, alleged that Contractor had become indebted to the District for a sum in excess of $2,100,000.

## 3.    Bench Trial Regarding Two Schools

The parties agreed to conduct a bench trial as to two schools—Birmingham High School and Burroughs Middle School—to resolve legal issues common to all the District's claims. The court issued its final statement of decision on April 25, 2014, and it was subsequently incorporated into the final judgment.

### 3.1.    Phase I

In Phase I, the District ordered Contractor to procure kitchen equipment for the new cafeterias. No construction work was required for Phase I. Initially, the District required Contractor to obtain the equipment from a company called Duray. Because the equipment requested by the District was not found in the construction task catalog, Contractor submitted job order proposals using the NPP pricing formula set forth in the 2005 General Conditions, i.e., Contractor's cost plus a five percent mark-up. The District rejected those proposals. The District then directed Contractor to obtain the equipment from a

company called TriMark. The total cost of the equipment from TriMark for Phase I was $170,777 per school.

The TriMark equipment requested by the District was not included in the construction task catalog. But the District gave Contractor a copy of a job order proposal (Torres proposal) from another contractor working on Phase I of the Café LA project and told Contractor to "mirror it." The Torres proposal used the CTC pricing formula. Contractor understood that by asking it to "mirror" the Torres proposal, the District wanted Contractor to submit job order proposals using the CTC pricing formula with the same or a very similar proposed price. Although the TriMark equipment was not found in the construction task catalog, Contractor's job order proposals applied the CTC pricing formula. Essentially, Contractor created its job order proposals using artificial quantities of items found in the construction task catalog that were in some cases similar to the TriMark equipment to reach the desired proposal price: $244,999 (Birmingham) or $245,000 (Burroughs).[26] Contractor referred to this methodology as "closest to CTC."

Contractor never intended to supply the District with the construction task catalog items listed on the job order proposals and that fact was evident on the face of the proposals. Every line item in Contractor's job order proposals cross-referenced an item

---

[26] The Birmingham and Burroughs job orders were issued under different master job order contracts (0530014 and 0530003, respectively) and the construction task catalogs contained different pricing. Although the Birmingham and Burroughs job order proposals were not identical, the proposals used the same methodology, i.e., artificial quantities of catalog items that were never intended to be used on the projects.

of equipment on the TriMark purchase order issued to Contractor and indicated that the TriMark item would be provided instead of the listed item from the construction task catalog. In the Burroughs job order proposal, for example, Contractor included a line item for "Three Drawer, 36 Roll Capacity Food Warmer." That line item included a note stating, "Used for Item #12-Mobile Rack w/ Insulated Cover, Model #PR-Combo-X (2 units)," the same item number and descriptor used in one line item of the TriMark purchase order. The quantities of items were also artificial. The Burroughs proposal included a line item for "Bread Dispenser, Counter Top." Contractor proposed a quantity of 3.61 dispensers even though a bread dispenser was not available in fractional quantities. The bread dispenser line item was filling in for another item contained in the TriMark purchase order—four condiment organizer bin racks. These obvious irregularities notwithstanding, the District accepted the job order proposals, Contractor procured the TriMark equipment requested by the District, and the District paid the agreed-upon price.

At trial, the District presented testimony by an auditor retained by the District's Office of Inspector General to perform a cost audit relating to Contractor's work on the Café LA program. The auditor concluded that Contractor breached the master job order contracts by failing to price its job order proposals as required under the General Conditions, i.e., by applying the CTC pricing formula to fictional quantities of construction task catalog items that would not be used on the project rather than using the required NPP pricing formula and applying it to its actual cost to procure the TriMark equipment. If Contractor had used the NPP pricing formula properly, the District urged, each of the job order proposals for Phase I would have been priced at $179,316 rather

17

than $249,999 or $245,000, resulting in damages of $65,684 for Birmingham and $65,685 for Burroughs.

Contractor maintained that its "closest to CTC" methodology was valid and that Café LA program manager Charlene Franck had specifically directed Contractor to use that methodology when she said to "mirror" the Torres proposal.

Following the bench trial, the court found in favor of the District on its Phase I claims. Specifically, the court summarized the two formulas from the General Conditions—the CTC pricing formula and the NPP pricing formula—and noted that Contractor did not properly apply either of those formulas in its Phase I job order proposals. Instead, in an effort to mirror the Torres proposal provided by the District, Contractor purported to use the CTC pricing formula and selected items from the construction task catalog even though the TriMark equipment was not found in the catalog. It also applied a 24 percent adjustment factor across the board rather than its competitively bid adjustment factors which varied among the master job order contracts, and used fictitious (and sometimes fractional) quantities of the catalog items, all in order to reach a proposed job order price of approximately $245,000.[27]

The court concluded that Contractor's methodology breached the applicable statute as well as the master job order

---

[27] Each of Contractor's master job order contract bids included three adjustment factors that applied to work performed during regular school hours (weekdays 7:00 a.m. to 3:00 p.m.), overtime hours (weekdays 3:00 p.m. to 11:00 p.m.), and premium overtime hours (weekdays 11:00 p.m. to 7:00 a.m., weekends, and holidays.) In the master job order contracts at issue, Contractor's adjustment factors range from 0.9911 to 1.4000.

contract pricing provisions. By statute, Contractor's job order proposal should have been based on the construction task catalog and proposed appropriate quantities of the necessary tasks. (§ 20919.1, subd. (*l*).) The General Conditions also required Contractor to use the specific pricing formulas contained therein. But as to the Phase I proposals, the court found, Contractor did not follow the procedure required by statute or contract: "For Phase I contracts, [Contractor] applied a CTC adjustment factor, when it should have applied the NPP factor for non-CTC TriMark equipment, and [Contractor] manipulated the unit quantities in its proposals so as to obtain payment from the District for never-delivered, never-installed quantities and, moreover, to apply the CTC adjustment factor on the phantom quantities."

The court rejected Contractor's contention that the District's approval of the job order proposals and issuance of notices of completion after the work was complete barred it (due either to waiver or estoppel) from seeking damages for breach of contract. With respect to estoppel, the court concluded that Contractor's claim failed both as a factual and as a legal matter.[28] First, the court found that Franck's directive to "mirror" the Torres proposal did not mean that she wanted Contractor to match the price on that proposal or to use fictional quantities of catalog items to inflate its job order proposal prices. "These were

---

[28] As the court noted, four elements are required for an equitable estoppel defense: the party to be estopped was aware of the facts, the party to be estopped intended to induce reliance, the party asserting estoppel was ignorant of the facts, and the party asserting the estoppel suffered injury. (See, e.g., *Alameda County Deputy Sheriff's Assn. v. Alameda County Employees' Retirement Assn.* (2020) 9 Cal.5th 1032, 1072 (*Alameda*).)

decisions that [Contractor's] executives made on their own and not in reasonable reliance on any direction given by Franck or any other District representative." Second, and in any event, the court concluded Contractor failed to establish any of the necessary elements of an equitable estoppel defense. In particular, the court noted, Contractor could not prove that it was ignorant of the true facts: "[I]t was aware of the correct pricing mechanism for its revised proposals: NPP pricing is required [by the General Conditions] and bidding of only 'appropriate quantities [for] each task' is required by Section 20919.1."

As to waiver resulting from the District's acceptance of the job order proposals, the court noted that the General Conditions included a provision stating that any action or inaction by the District did not constitute a waiver of a right, remedy, or duty under the contract. Finally, the court rejected Contractor's notion that the District's recording of notices of completion on the projects constituted a "ratification" that absolved Contractor of any liability for breach of contract because the General Conditions provided that Contractor's duty to perform in compliance with the contract document was absolute and that acceptance of the work by the District did not release it from liability.

### 3.2. Phase II

In Phase II, the District required Contractor to procure additional kitchen equipment from TriMark. Again, no construction work was required. TriMark provided Contractor with a purchase order for each of the two schools. The total price for the additional equipment needed for Birmingham was $166,787 and for Burroughs, the price was $166,543.

For each of its Phase II job order proposals, Contractor purported to use the NPP pricing formula. Each line item in the job order proposals specified the number of units of TriMark equipment to be provided and designated the line item as a non-prepriced item as required under the General Conditions. The unit prices set forth in the job order proposal, however, reflected a 25 percent mark-up over the actual cost of the TriMark equipment. For example, Contractor's Phase II job order proposal for Birmingham included a line item for "Night Cover." The cost to purchase that item from TriMark was $790 per unit but the price listed in the job order proposal was 25 percent higher: $987.50 per unit. Every line item in the job order proposals for the two schools was calculated and presented in the same manner—designated as non-prepriced but the price listed was 25 percent higher than Contractor's cost to obtain the item. The total bid for Birmingham was $208,458.75 and the total bid for Burroughs was $208,166.25.[29]

The District contended at trial that Contractor breached the master job order contracts by failing to properly apply the NPP pricing formula in its job order proposals. According to the District's auditor, if Contractor had applied the appropriate five percent mark-up found in the NPP pricing formula, the proposed job order price for Birmingham would have been reduced by $33,332 and for Burroughs, the reduction would have been $33,296.

---

[29] The job order proposals were identical with the exception of one line item. Birmingham required two LCD monitors with speakers while Burroughs required only one. Those line items, together with applicable tax, account for the price differential between the two proposals.

Contractor's Vice-President Timothy Stone testified that the District's regional project manager, Paul Metoyer, had agreed to a 25 percent mark-up over cost for the TriMark equipment needed for Phase II. Stone stated that when he heard there would be a second phase of procurement of non-prepriced equipment, he contacted Metoyer to negotiate the mark-up. Stone explained to Metoyer that the generally applicable five percent mark-up did not even cover Contractor's overhead, which was 16 percent, and that Contractor would prefer that the District select another contractor if they could not negotiate a reasonable solution. Metoyer denied making such an agreement, however.

The court again ruled in favor of the District. As the court noted, it was undisputed that Contractor created its Phase II job order proposals by applying the NPP pricing formula but with a 25 percent mark-up to the equipment purchased from TriMark. The NPP pricing formula contained in the 2005 General Conditions, however, required Contractor to apply a five percent mark-up over its cost.[30] The court rejected Contractor's contention that Metoyer agreed to a 25 percent mark-up. First, Metoyer denied making such an agreement and Stone did not make any record of the telephone conversation in which he claimed that such an agreement was reached. Second, the General Conditions state that verbal communications are not binding. Third, and in any event, the court concluded that Metoyer lacked the authority to modify the contract documents in a manner that would allow Contractor to apply a 25 percent mark-up to non-prepriced items. Contractor, as a party

---

[30] As noted, the 2007 General Conditions permitted Contractor to apply a 15 percent mark-up when using the NPP pricing formula.

contracting with a public entity, was chargeable with knowledge of the restrictions on Metoyer's authority.

### 3.3. Phase III

In Phase III, the District directed Contractor to install equipment purchased during the first two phases and to perform the electrical work required to support the new equipment. The District did not assert, as it did with respect to Phases I and II, that Contractor failed to use the pricing formulas required by the General Conditions. Instead, the District argued that the General Conditions required every item included in a job order proposal to be "reasonable and necessary." The District chose five line items from the Birmingham and Burroughs job order proposals and offered expert testimony, based in large part on visual inspections made years after job completion, that Contractor either did not use line items included in its job order proposals or used a lesser quantity of those line items than Contractor estimated might be required. On that basis, the District argued that Contractor's proposals were "overpriced." And although the job orders were firm, fixed-priced lump sum contracts, the District claimed that a document retention and audit provision in the General Conditions allowed the District to recover damages for "overpricing."

The District's electrical engineering expert reviewed the design drawings, conducted a site visit, and "came up with what [he] evaluated as a reasonable cost of the work to accomplish this scope that is defined in the scope of work and on the design drawings, and then as we confirmed in the field, contrasted to what was the cost proposed by the contractor proposal document." As to Burroughs, for example, he opined that a reasonable cost for the work as completed was $51,145.35

whereas the job order price was $139,748.53. He addressed several line items specifically and opined that the quantities listed in Contractor's job order proposal were substantially greater than the quantities he estimated had actually been used. He acknowledged several times, however, that cost estimating is not an exact science.

On cross-examination, the District's expert rejected the idea that Contractor's actual cost to perform the work was relevant to his analysis of whether Contractor's proposed job order prices were reasonable. For example, although Contractor paid its subcontractor $77,000 for the electrical work performed at Burroughs, the expert maintained that the reasonable value of the work was only $51,000. He conceded, however, that his cost estimates were significantly lower than the independent estimates obtained by the District prior to construction. The independent estimate for electrical work at Burroughs, for example, was $94,839.

The District presented testimony from a second expert regarding the non-electrical work performed during Phase III. That expert also opined that the reasonable value of the work performed by Contractor was substantially less that the agreed-upon price. As to Birmingham, for example, he calculated the reasonable value of the work was $51,237 as compared to the job order price of $117,267. He also examined specific line items and compared the proposal to the work actually performed. For example, the Burroughs job order proposal included a line item for 16 hours of "investigative engineering," which could include an inspection for asbestos or investigative work by another specialized consultant. But the expert did not see any records

indicating that Contractor actually utilized any investigative engineering services.

Contractor argued that the District determined the proposed job order prices were reasonable when it accepted the job order proposals. The District had received transparent proposals that disclosed every line item, quantity, and price proposed by Contractor, and it also had received job order estimates from an independent party. Under the contract terms, the District was required to (and did) assess the reasonableness of the proposed price at the time it was submitted and in connection with its decision to accept or reject the job order proposal. Nothing in the master job order contracts or in the applicable statute (§ 20919.11), Contractor contended, permitted the District to change its mind years later and claim that the agreed-upon job order prices were unreasonable.

Contractor also presented an electrical engineering expert to evaluate the job order proposals for Phase III. The expert reviewed the materials available to Contractor at the time it generated its job order proposals—the plans and specifications and the construction task catalogs—as well as the District's independent estimates, which were prepared prior to construction. The expert generally concluded that Contractor's proposed prices were reasonable. He also visited both schools and opined that Contractor completed the detailed scope of work and that the projects were in good working order. The expert noted that there were variances between the plans, the job order proposals, and what was actually installed. But he indicated that some degree of variance was expected, and he observed variances in both directions, i.e., the use of greater quantities than proposed and the installation of items not proposed as well as the

use of lesser quantities and the elimination of some proposed items. As a whole, however, he concluded that Contractor's job order proposals were reasonable. He also noted that the independent estimates obtained by the District were higher than Contractor's proposed price for both Birmingham and Burroughs, while the calculations performed by the District's trial experts were far lower—"there is a huge discrepancy." The expert also compared Contractor's costs, i.e., the amounts billed by subcontractors, to the District's experts' estimates of the reasonable value of the work and determined that the District's estimates were not credible.

Contractor representative Timothy Stone also testified to some of Contractor's actual costs to perform the Phase III work. Stone said that if the court awarded damages based on the District's estimates of the reasonable value of the work, Contractor would lose $126,000 on the job orders for the Phase III work at Birmingham and Burroughs.

The court ruled in favor of Contractor. The court noted that the work required for Phase III was substantially different from Phases I and II, as Phase III involved demolition and construction work to be performed on a compressed time schedule. In addition, the court found that the District had set its own standard to assess the reasonableness of Contractor's job order proposals. Specifically, if the job order proposal price did not exceed the independent estimate by more than 20 percent, the District was authorized to accept Contractor's proposal without special senior management approval and proceed with the project.

The District had urged that the "appropriate quantities" requirement found in section 20919.1, subdivision (*l*),[31] applied to individual line items (rather than the proposals as a whole) and could be evaluated retrospectively, i.e., by comparing the job order proposal line items to the items and quantities ultimately used on the project. The court rejected that argument and noted that, in any event, the District only offered evidence as to five line items out of the 174 line items (Birmingham) or 161 line items (Burroughs) contained in the job order proposals at issue. The court concluded that this small number of variances was insufficient to establish a breach of the master job order contracts.

The court also rejected the District's reading of the applicable statutes: "[U]nder the District's interpretation, [Contractor] breached the Phase III Burroughs Job Order Contract because it did not actually use these particular components in the construction: Wiremold 6000, RGS 2" Conduit with coupling, and the RGS Fire Stop Fittings. This is an entirely too narrow reading of the statute. The statute envisions that in proposing work for a construction [project] the contractor shall itemize the materials and quantities in good faith to complete the design. During the course of construction, quantities of the bid materials may be changed or other materials that are functionally equivalent for the project may be substituted for the bid materials. [Contractor's] subcontractors did not install

---

[31] That section provides in pertinent part: " 'Proposal' means the job order contractor prepared documents quoting those construction tasks listed in the catalog of construction tasks that the job order contractor requires to complete the project scope of work, together with the appropriate quantities of each task."

27

Wiremold 6000, but they did, according to the evidence, install quantities of Wiremold 4000 (a material not even found in [Contractor's] proposal) as a functional substitute of Wiremold 6000."

Finally, the court questioned the District's theory of liability generally: "If the governing standard for 'reasonableness' is the price paid by the District, how is that reasonableness to be determined. The court's recollection is that the experts from both sides concluded that [Contractor's] proposal was within 20% of a reasonable estimate to accomplish the Phase III construction required by the [detailed scope of work] and the proposal. It is unlikely that the court could conclude that individual line items were overpriced if the price for the entire remodeling project was reasonable." But the court did not address that issue further, as the District had focused solely on five line items at trial.

### 3.4. Sureties

Following the bench trial, the court heard argument regarding the liability of Sureties for Contractor's breach of contract as to Phases I and II. It was undisputed that Sureties issued bonds covering Contractor's work on the two schools at issue in Phases I and II. Sureties contended, however, that the operative complaint only attempted to recover from Sureties as to Phase III, and that they had no notice the District planned to assert claims against them as to Phases I and II. Sureties also argued the bonds had been exonerated by the District's negligent overpayments to Contractor.

The Court found Sureties liable for Contractor's breaches of contract as to Phases I and II. The court noted that the bonds

incorporated all the contract documents[32] and set out the possible actions to be taken by Sureties in the event of Contractor's default. The bonds provided that "[w]henever Contractor/Principal is declared by [the District] to be in breach/default/deficient under the Contract and/or the Owner exercises its right to terminate the CONTRACTOR'S right to proceed, [the District] having given Notice to the CONTRACTOR and Surety as required by the Contract, if any, the Surety shall do one or more of the following: [¶] 1. Promptly remedy, and/or start to remedy, the declared default/breach/deficiency …; and/or [¶] 2. Complete the Contract in accordance with its terms and conditions; and/or [¶] 3. Pay to the Owner an amount not less than one hundred percent (100%) of the Contract Amount … to fully and completely compensate [the District] for any and all damages, losses and injuries suffered by [the District] as a result of [Contractor's] breach(es) of the Contract."

The court concluded that under the circumstances, the third option—payment of funds to compensate the District for

---

[32] The District's 2005 General Conditions define "Contract Documents" as "The Bid and Acceptance Form, Addenda, bid (including documentation accompanying the bid and any post bid documentation submitted after the Notice of Intent to Award) when attached as an exhibit to the Bid and Acceptance Form, the Notice to Proceed, the bonds, these General Conditions, the Supplementary Conditions, the Specifications and the Drawings, together with all Job Orders, Change Orders, Construction Directives, Written Option Agreements, and ARCHITECT or [Owner Authorized Representative] written interpretations and clarifications issued pursuant to Article 9.4." The bid and acceptance form, once it is accepted by the District, sets Contractor's adjustment factor for job orders subsequently issued under the master agreement. The 2007 General Conditions contain a similar definition.

29

damages—was applicable. The court also rejected Sureties' argument that they had no notice of the District's claims against the bonds because it was undisputed that the District served Sureties a response to their Bill of Particulars which listed the Phase I and II claims. Sureties had also argued that the District's knowledge (or at least suspicion) of irregularities in Contractor's job orders barred liability of the Sureties. The court found, however, that the language of the bonds and the General Conditions did not support that a conclusion. Finally, the court confirmed that Sureties were liable for all Contractor's breaches of contract, not solely those breaches relating to the performance of construction tasks. The court relied on the bond language stating that all the contract documents were incorporated into the bonds and the contract requirements that included Contractor's accurate use of the pricing formulas set forth in the General Conditions. The court further found that Sureties were liable, under the language of the bonds, for the District's attorney's fees.

### 3.5. Damages and Prejudgment Interest

The court served its final statement of decision on April 25, 2014. As to Birmingham High School, the court awarded $65,683 damages for Phase I and $33,314 for Phase II. Similarly, the court awarded damages of $65,684 for Phase I and $33,314 for Phase II relating to Burroughs Middle School. The damages award was made jointly and severally against Contractor and Sureties. The court also concluded that the District was entitled to prejudgment interest under Civil Code sections 3287, subdivision (a) and 3289, subdivision (b), in an amount to be

30

determined.[33] The court found in favor of Contractor and Sureties as to the District's Phase III claims. And, the court noted, attorney's fees could be recovered under a reciprocal provision in the bonds in an amount to be determined by posttrial motions.[34]

### 4. Summary Adjudication Regarding Phase I and Phase II Job Order Proposals for Remaining Schools

After the bench trial, the District moved for summary adjudication of its remaining breach of contract claims relating to Contractor's job order proposals for Phases I and II.[35] The court's statement of decision, dated December 19, 2014, was incorporated into the final judgment.

---

[33] On March 11, 2015, the court granted the District's motion for prejudgment interest and set forth the formula to be used to calculate the interest, subject to offset relating to funds withheld by the District due to Contractor on other projects. On May 19, 2015, the court granted the District's motion for prejudgment interest against Sureties. Those rulings were incorporated into the final judgment.

[34] The court's award of attorney's fees and costs to the District is the subject of *Los Angeles Unified School District v. FH Paschen/S.N. Nielsen, Inc.* (B303169, app. pending), which we have stayed pending the resolution of this matter.

[35] In its briefing below and on appeal, and again at oral argument, the District claimed the parties agreed to be bound by the court's factual findings from the bench trial. No evidence supports that contention. The citation relied upon by the District in its appellate briefing, and provided to this Court at oral argument, is a stipulation that relates to the filing of a complaint in case No. BC579782 regarding the District's Phase III claims and has nothing whatsoever to do with the binding effect of factual findings made during the bench trial.

31

### 4.1.   Phase I

The job order proposals for the remaining 27[36] Phase I schools related to three master job order contracts (0530014, 0530017, 0530020), each of which incorporated the 2005 General Conditions. The same set of kitchen equipment procured for Birmingham and Burroughs was procured from TriMark for the other 27 schools. And as it did for Birmingham and Burroughs, TriMark charged Contractor $170,777 for each set of equipment required in Phase I. As before, the TriMark equipment was not found in the construction task catalogs.

Contractor used the same pricing methodology it used for Birmingham and Burroughs in its job orders proposals for the other 27 Phase I schools, i.e., it purported to apply the CTC pricing formula, selected items from the construction task catalog that it did not plan to use, and manipulated the quantities of those items to reach the desired proposal price. Indeed, Contractor prepared one template for the Phase I job order

---

[36] The District issued Contractor job orders relating to 30 schools in Phase I. The bench trial resolved the claims relating to Birmingham High School and Burroughs Middle School. The District withdrew its claim regarding Banning High School. The remaining 27 schools at issue were: Chatsworth High School, Crenshaw High School, El Camino Real High School, Hamilton High School, Kennedy High School, Los Angeles High School, North Hollywood High School, Northridge Academy High School, Sylmar High School, Taft High School, University High School, Van Nuys High School, Venice High School, Emerson Middle School, Hale Middle School, Henry Middle School, Lawrence Middle School, Maclay Middle School, Marina del Rey Middle School, Mulholland Middle School, Nobel Middle School, Palms Middle School, Portola Middle School, San Fernando Middle School, Sepulveda Middle School, Wright Middle School, and Laces Magnet.

proposals and used it for every Phase I school. The total job order price proposal for each school was either $249,998.90 (as Birmingham) or $245,000 (as Burroughs.) As it asserted at the bench trial, the District argued Contractor breached the master job order contracts by failing to use the NPP pricing formula as required under the General Conditions. The District also claimed the same damages of $65,683 or $65,684 per school, which totaled $1,773,460 for the 27 schools.

In opposition, Contractor argued that certain disputed material facts precluded summary adjudication. Specifically, one of the contractual pricing provisions had not been at issue during the bench trial because that trial related only to *two* schools. But the General Conditions contained a provision that applied after non-prepriced items were used *three* times. Article 6.61.3.4.3.7 of the 2005 General Conditions (repeated use provision) states: "After using a non-prepriced item on three separate Work orders, the unit price for the work item will be negotiated and fixed as a permanent pre-priced item, which will no longer require price justification." In other words, when a non-prepriced item was used repeatedly, the parties were required to negotiate a mutually-agreeable, CTC-equivalent price for that item. Contractor would then use the parties' negotiated price for the item in future job order proposals, applying the CTC pricing formula. According to Contractor, because the court had not considered the evidence presented at the bench trial in the context of the repeated use provision, it could not resolve the issue as a matter of law on a motion for summary adjudication.

Contractor's Vice-President Timothy Stone, who testified during the bench trial, submitted a declaration in support of Contractor's opposition to the motion for summary adjudication.

33

With regard to the repeated use provision, Stone attested to the following: "The District insisted that all Phase I job orders be priced using the Torres proposal as the template for all of the pricing of the equipment. This order by the District was part of the negotiations between the parties for the pricing of the equipment. I participated personally in the negotiations for Phase I, where the equipment was all priced based on the District's choice to use the prices found in the Torres template. Specifically, the District insisted on the specific prices found in the Torres template as the negotiated price for the Phase I equipment." In short, he contended, the parties *had* negotiated prices for the TriMark equipment and those negotiated prices were reflected in Contractor's job order proposals.

The District contended, however, that Contractor was barred from relying on the repeated use provision with respect to Phase I because it had not actually used the NPP pricing formula to develop its job order proposal prices. It had instead purported to use the CTC pricing formula. Further, and even if the court determined that the repeated use provision was applicable, the District asserted that no binding action could have been taken by the District's staff with respect to a price adjustment because any contract amendment had to be approved by the District's board.[37]

The court ruled in favor of the District. As the court noted, almost all of the material facts were undisputed and consistent

[37] The District seemed to suggest that a modification of the NPP pricing formula contained in the master job order contracts would be required and would, moreover, require Board approval. But that is not what the General Conditions contemplate. They contemplate a price negotiation regarding specific, repeatedly-used non-prepriced items, not a wholesale revision of the NPP pricing formula.

with the evidence presented at the bench trial. The court reached the same overarching conclusions it had reached during the bench trial: Contractor violated the master job order contract pricing provisions with respect to its Phase I proposals by using the CTC pricing formula, selecting construction task catalog items never intended to be used, creating fictitious unit quantities, and applying a 24 percent adjustment factor across the board. Contractor should have used the NPP pricing formula, as required under the General Conditions.

The court rejected Contractor's contention that the parties had negotiated pursuant to the repeated use provision and agreed to the prices set forth in the Phase I job order proposals. Specifically, the repeated use provision required the parties to negotiate a fixed price for repeatedly used items (such as the TriMark equipment) not found in the construction task catalog. From that point forward, Contractor would apply the CTC pricing formula in its job order proposals, using the negotiated fixed price. But Contractor's Phase I job order proposals did not follow that pattern and instead improperly used items from the catalog that were not intended to be used on the projects and applied a 24 percent adjustment factor rather than Contractor's competitively-bid adjustment factor. In other words, the court found that Stone's representation concerning the alleged negotiation did not match Contractor's actual pricing method. The court awarded damages of $1,773,460.

### 4.2. Phase II

The job order proposals for the 27 Phase II schools at issue related to four master job order contracts (0530014, 0530020, 0630021, 0630028) that incorporated the 2005 General

Conditions and one master job order contract (0830022) that incorporated the 2007 General Conditions.[38]

Unlike Phase I, in which an identical set of equipment was ordered for each of the schools, the equipment procured in Phase II varied somewhat from school to school. As with Birmingham and Burroughs, the TriMark equipment procured for the additional Phase II schools was not found in the construction task catalog. Contractor's job order proposals properly listed the TriMark equipment required for each school and designated every line item as a non-prepriced item. But Contractor did not properly apply the NPP pricing formula. In some of the job order proposals, Contractor used its cost for the TriMark equipment but did not use the five or 15 percent mark-up used in the NPP pricing formula. In the job order proposal for Emerson Middle School, for example, the line item unit prices matched the TriMark purchase order prices and Contractor applied an adjustment factor of 1.2472 (approximately a 25 percent mark-up over cost.) In other job order proposals, no

---

[38] The District issued job orders under the 2005 General Conditions for 17 schools: Chatsworth High School, Crenshaw High School, Emerson Middle School, Hale Middle School, Henry Middle School, Hamilton High School, King Middle School, Lawrence Middle School, Marina del Rey High School, Mulholland Middle School, Nobel Middle School, San Fernando Middle School, University High School, Wright Middle School, Van Nuys High School, Venice High School, and Virgil Middle School. It issued an additional 10 job orders under the 2007 General Conditions for the following schools: Banning High School, El Camino Real High School, Kennedy High School, Los Angeles High School, North Hollywood High School, Northridge Academy High School, Portola Middle School, Sepulveda Middle School, Sylmar High School, and Taft High School.

mark-up was applied but the line item unit prices in the job order proposal reflected a 25 percent mark-up over Contractor's cost to obtain the equipment from TriMark.

The District argued, as it had during the bench trial, that Contractor breached the master job order contracts when it formulated its job order proposals for Phase II. Although Contractor purported to use the NPP pricing formula, it applied a 25 percent mark-up over its cost to obtain the equipment from TriMark, rather than the five or 15 percent mark-up permitted under the General Conditions.[39] The District also relied on Paul Metoyer's trial testimony that he had not negotiated a 25 percent mark-up with Contractor, as Timothy Stone had claimed. Moreover, the District asserted, Metoyer did not have the authority to alter or amend the master job order contracts to increase the percentage in the NPP pricing formula. The District further argued that the repeated use provisions[40] did not assist Contractor because any job order contract modification would have needed to be approved by the District's Board. The District claimed damages for the 27 schools in the amount of $700,597.

Contractor's opposition to the District's Phase II motion for summary adjudication asserted the same arguments presented in

---

[39] Article 6.61.3.4.3.4 of the 2005 General Conditions provided for a five percent mark-up on non-prepriced items. Article 6.28.4.2 of the 2007 General Conditions provided for a 15 percent mark-up.

[40] Article 6.27.6 of the 2007 General Conditions also contains a repeated use provision which states, in pertinent part, "After using a Non-Prepriced item on three separate Work orders, a base unit price, equivalent to the price of Work units contained in the Gordian Group Construction Task Catalog …, will be negotiated and treated as a CTC unit priced item that does not require further price justifications."

its Phase I opposition. Contractor again noted that the repeated use provisions of the 2005 and 2007 General Conditions required the parties to negotiate a mutually-agreeable CTC-equivalent price for the TriMark equipment and then apply the CTC pricing formula after the equipment had been used on three job orders. According to Contractor, the court had not considered the evidence of negotiations presented at the bench trial in the context of the repeated use provision and could not resolve the issue as a matter of law on a motion for summary adjudication.

Contractor's Vice-President Timothy Stone, who testified during the bench trial, submitted a declaration in support of the opposition to the motion for summary adjudication. With regard to the repeated use provision, Stone attested to the following: "The District insisted that all Phase II job orders be priced using NPP. This order by the District started the negotiations between the parties for the pricing of the equipment. I participated personally in the negotiations for Phase II. As evidenced by the email of the District employees …, [Contractor], as well as the other contractors, negotiated pricing that was a 25% mark-up on top of NPP as the value of the items to be provided by [Contractor]." In short, Contractor asserted that Stone *had* negotiated a mark-up for the non-prepriced TriMark equipment with now-unnamed District employees and that the agreed-upon price was reflected in its job order proposals.

The court ruled in favor of the District. As the court noted, almost all of the material facts were undisputed and consistent with the evidence presented at the bench trial. The court reached the same overarching conclusions it had reached following the bench trial: Contractor violated the master job order contracts with respect to its Phase II proposals by using the NPP pricing

38

formula with a mark-up of approximately 25 percent instead of the contractually authorized mark-up of five or 15 percent. The court rejected Contractor's contention that the parties had negotiated pursuant to the repeated use provisions and agreed to the prices set forth in the Phase II job order proposals. Specifically, the court found that Stone's representation concerning the alleged negotiation, together with an internal email drafted by District staff member Edwin Cartagena, failed to raise a triable issue of fact on that point. The court remarked that Stone's declaration was fatally vague, as it did not identify any person that he negotiated with nor did he provide any facts suggesting that the unnamed District representative had the authority to make such an agreement. And Cartagena's email, which referenced a 24 to 25 percent contractor mark-up, was also vague and failed to establish (or even suggest) that any such agreement was made by a person with authority to do so. The court awarded damages of $700,597.

## 5.    Jury Trial Regarding Remaining Phase III Schools[41]

Pursuant to a stipulation of the parties, the District's claims regarding the remaining Phase III schools were tried to a jury.

### 5.1.   Motion in Limine

Contractor and the District filed a number of motions in limine prior to trial. As pertinent here, the District moved to exclude all evidence of Contractor's actual cost to perform the job orders at issue in Phase III. The District urged that Contractor's

---

[41] Although Judge Richard L. Fruin made most of the rulings in this litigation, the jury trial was conducted by Judge Victor E. Chavez.

cost to perform the job orders was irrelevant. Specifically, the District noted that section 20919.1, subdivision (*l*), required Contractor to include only "appropriate" quantities of each construction task in its job order proposals. Similarly, the District asserted, the General Conditions obligated Contractor to propose items that were "reasonable," "required," and "necessary" to accomplish the work. The District explained its theory of liability as follows: "The District contends [Contractor] instead included units and quantities of work in its Phase III proposals that were not required, necessary or reasonable for the tasks to be performed, resulting in an overpricing of the proposals and as a result, the Job Orders." The District argued that evidence of Contractor's actual cost to perform the work would be confusing to the jury and highly prejudicial: "After the [job order contract] has been awarded based upon the adjustment factor bid by the contract[or], the contractor's subsequent, *actual* profit or loss from one job order to another is irrelevant and immaterial to whether the contractor followed the contractual pre-priced formula in pricing its Job Order Proposals."

Contractor opposed the motion and agreed that the central question in the litigation concerned the "reasonableness" of its job order proposals. But Contractor asserted that it could "only be held to what any reasonable person could estimate at the time[.]" In other words, "reasonableness" could not be determined in a vacuum or with reference to some objective standard created by the District's experts. Instead, Contractor noted, pursuant to statute and the master job order contracts, the District determined whether the job order proposals were reasonable at the time it reviewed the proposals and decided whether to accept them. In any event, Contractor urged, to the extent some external

40

measure might be used to evaluate the reasonableness of its job order proposals, its actual cost to perform the work was the best evidence. And that evidence would show that if the District's experts' post hoc assessment of "reasonableness" was applied, Contractor would suffer substantial losses on the work it performed during Phase III.

In reply, the District emphasized that Contractor was statutorily and contractually required to price its job order proposals in accordance with the pricing formulas set forth in the General Conditions, which in turn allowed Contractor to include only "appropriate quantities" of construction tasks (§ 20919.1, subd. (*l*)) that were "reasonable and necessary" for the work to be performed (Art. 6.61.3.4).

The court granted the District's motion.[42]

### 5.2. Trial

The jury trial regarding the remaining Phase III schools proceeded much as the bench trial did. The heart of the District's case was presented through the testimony of the same experts who testified at the bench trial. The electrical engineering expert again explained that he was hired to determine the reasonable value of the work performed at each of the 13 schools at issue. He prepared a packet of information evaluating the work required at each of the 13 schools which included a spreadsheet examining 150 to 200 line items relating to electrical work proposed and apparently performed, based on what he could see during his site inspection. Over the course of four days, the expert testified in

---

[42] Contractor filed a motion during the trial essentially requesting that the court reconsider its ruling. The court summarily denied the request.

detail to his opinion about the items and quantities that were required to perform the detailed scope of work as compared to (a) what appeared to have been installed and (b) what was contained in Contractor's job order proposals. He concluded that each of Contractor's job order proposals was substantially overpriced and that the District's damages per school ranged from approximately $50,000 to $150,000. In total, the expert concluded that the District's damages on the 13 Phase III schools amounted to $1,448,646.88.

The District also presented testimony by its expert in non-electrical construction work. As he did at the bench trial, that expert opined that Contractor's job order proposal prices were inflated. He based his opinion on his review of the contract documents, including plans and drawings, as well as site visits he conducted or which were conducted by another person in his office. Over the course of several days' testimony, the expert compared his estimate of the reasonable cost of the work required to complete the detailed scope of work with (a) what appeared to be installed at the schools, (b) Contractor's expert's opinion on the matter, and (c) what was contained in Contractor's job order proposals. Overall, he concluded that as to non-electrical work items, Contractor's proposed prices were inflated and the damages to the District amounted to $124,459.39.

According to the District, the pricing provisions and the audit provision, when read together, meant that Contractor was "contractually obligated to price its proposals with only the required quantities from the CTC necessary to do the work, and if [Contractor] breaks that deal, it is subject to audit for overpricing." The District noted that the General Conditions required Contractor to use the pricing formulas set forth therein.

42

It also cited the audit provision contained in the General Conditions, which required Contractor to retain documents and records relating to all job orders and work performed under them. The 2005 audit provision provides, in pertinent part, "If an audit, inspection and/or examination under this Article 6.55 discloses overpricing or overcharges of any nature by the CONTRACTOR to OWNER in excess of one percent (1%) of the Total Contract Amount, then, in addition to all other OWNER rights and remedies, and in addition to making adjustments for the overcharges and/or overpricing, the reasonable actual cost of the OWNER audit, inspection, and/or examination shall be reimbursed to OWNER by CONTRACTOR."

Contractor, by contrast, focused mainly on the meaning of a firm, fixed-price lump sum contract. In its view, it was entitled to be paid the agreed-upon job order price if it performed the detailed scope of work. And it was undisputed that Contractor had fully performed the detailed scope of work under each job order at issue.

Contractor also presented its own experts, who had testified at the bench trial, regarding construction costs. The electrical engineering expert created his own detailed estimates for each of the 13 schools and compared his estimates to Contractor's job order proposals as well as the District's independent estimates obtained at the time of the job order proposal. As a general matter, all three sets of estimates were in a similar and reasonable range. When compared to the District's trial experts, however, a large discrepancy appeared. For Belvedere Middle School, for example, Contractor's job order proposal price was $159,013, compared to Contractor's expert's estimates of $139,836 and $104,943 using two methodologies, as

43

well as the District's independent estimate of $186,681. The District's trial expert's estimate was $45,783—less than 25 percent of the independent estimate the District obtained at the time it evaluated Contractor's job order proposal.

Contractor's other expert evaluated the non-electrical components of the scope of work and he reviewed the contract documents, Contractor's job order proposals, and the District's independent estimates. He also concluded that, when compared to his own estimates, Contractor's job order proposals and the District's independent estimates were both similar in amount and reasonable. But given the large differential between the District's trial experts' estimates and all the other estimates (Contractor's, the defense experts, and the District's independent estimate), he concluded that the District's trial experts' estimates were not credible.

The jury found in favor of the District on its claims relating to 13 of the 14 job orders[43] and awarded lump-sum damages of $855,000.

### 5.3. Contractor's Post-trial Motions

### 5.3.1. Motion for New Trial

Contractor moved for a new trial under Code of Civil Procedure section 657 on the grounds of excessive damages, insufficiency of the evidence to justify the verdict, verdict

---

[43] The jury found in favor of Contractor as to #0830030, regarding Berendo Middle School. The jury also found in favor of Sureties as to all 14 Phase III schools.

contrary to law, and prejudicial legal error during the trial.[44] As pertinent here, Contractor argued that the reasonableness of its job order proposals should be evaluated as a whole, and not on the basis of line item variances, as argued by the District. Specifically, Contractor cited section 20919.11, which provides, in pertinent part, "In order to prevent fraud, waste, and abuse, the [District] adopting job order contracting shall … :[¶] (a) Prepare for each individual job order developed under a job order contract an independent [District] estimate. The estimate will be prepared prior to the receipt of the contractor's offer to perform work [i.e., the job order proposal] and will be compared to the contractor's proposed price *to determine the reasonableness of that price* before issuance of any job order." (Italics added.) The General Conditions contain a similar directive in Article 6.61.3.4.3.5: "The OWNER will evaluate the entire proposal and proposed Work units and compare these with the OWNER's estimate of the scope of Work *to determine the reasonableness of approach, including the nature and number of Work units proposed. The OWNER will determine whether the CONTRACTOR's Proposal is in line with its own estimate.*" (Italics added.) Finally, Contractor noted that the District's training manuals instructed that a job order proposal did not require the approval of senior management if its total price was within 20 percent of the price of the independent estimate. Contractor urged that these governing standards did not permit a retroactive assessment of the reasonableness of

---

[44] One of Contractor's main arguments was that the court erred by excluding all evidence of Contractor's actual cost to perform the work. Due to our resolution of the issues relating to the Phase III job orders, we need not address that issue.

45

either the total proposed price in Contractor's job order proposals or specific line items contained therein.

Contractor also cited a portion of the statement of decision from the bench trial and urged that the court had previously rejected the District's application of a reasonableness standard at the line item level. Instead, the court had concluded, the statutes and contractual provisions indicated that the District was required to assess whether a job order proposal's price, *as a whole*, was reasonable before accepting a job order proposal. Contractor argued, in summary, that the jury's verdict was contrary to law because the District's "overpricing" theory was invalid and fully inconsistent with the concept that the job orders were firm, fixed-price lump sum contracts.

Contractor also asserted that the jury's damages award was excessive because it did not represent the bargain the parties had agreed to. The parties agreed to firm, fixed-price, lump sum job orders in which Contractor was entitled to payment in full if it completed the detailed scope of work, which it undisputedly did. The jury's damages award effectively reformed those contracts and reduced the agreed-upon price to an extent that was not bargained for by the District and would never have been agreed to by Contractor.

The court denied Contractor's motion for new trial. Regarding any legal error, the court focused solely on evidentiary rulings not at issue here and concluded that Contractor had not identified an error in law that would justify a new trial. The court also found sufficient evidence to support the jury's verdict, stating simply that the District claimed Contractor had overpriced its proposals and the jury awarded damages of $855,000 caused by the overpricing. The court also rejected

Contractor's claim that damages were excessive and reiterated that the District claimed Contractor had overpriced its proposals and the jury awarded damages of $855,000 caused by the overpricing.

### 5.3.2. Motion for Judgment Notwithstanding the Verdict

Contractor also moved for judgment notwithstanding the verdict and asserted arguments similar to those advanced in its motion for new trial. Primarily, Contractor argued that the District had not proved either that Contractor breached the job order contracts in pricing its job order proposals or that the District had been harmed by any failure to comply with the job order contract provisions. Contractor again noted that the applicable statute (§ 20919.11) and contract provisions (Art. 6.61.3.4.3.5) required the District to determine whether Contractor's job order proposal was reasonable before accepting the proposal. The District made that determination with the assistance of independent estimates and it had the ability to direct Contractor to remove any items from the job order that it found to be unreasonable. After the District determined that the job order proposal was reasonable and accepted it, the job order was a firm, fixed-price lump sum contract that could only be adjusted by change order. In other words, the fact that the District accepted the job order proposals was conclusive evidence that the proposals were reasonable. Thus, the District had no right to damages because it was undisputed that Contractor performed the detailed scope of work, as agreed, on every job order. Additionally, Contractor argued at length that the District's breach of contract theory was essentially a claim for rescission or reformation in disguise.

47

The court denied the motion. The court rejected Contractor's claim that the District was seeking to reform or rescind the contract. Instead, the court stated, the District claimed Contractor breached the contract by overpricing its proposals, the jury found the District had proved its case, and substantial evidence supported that conclusion.

## 6.     Judgment and Appeals

On July 2, 2019, the court entered a final judgment incorporating its prior rulings and the jury's verdict. For case No. BC485294, the judgment awarded the District damages of $2,672,052 and prejudgment interest of $2,167,359.63 for Phase I and Phase II work. After accounting for offsets relating to the District's withholding of payments due to Contractor on unrelated projects in the amount of $517,612.78, the total award in favor of the District and against Contractor and Sureties was $4,321,798.85. For case No. BC579782, the judgment in favor of the District and against Contractor was an additional award of $855,000 for Phase III work; judgment was entered in favor of Sureties on the District's Phase III claims.

The District, Contractor, and Sureties timely appeal.

## STANDARDS OF REVIEW

Most of the issues before us involve statutory construction and contract interpretation—issues we review independently. " ' "In statutory construction cases, our fundamental task is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. [Citation.] 'We begin by examining the statutory language, giving the words their usual and ordinary meaning.' [Citations.] If the terms of the statute are unambiguous, we presume the lawmakers meant what they said,

48

and the plain meaning of the language governs. [Citations.] If there is ambiguity, however, we may then look to extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such cases, we ' " 'select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' " ' [Citation.]" [Citation.]' [Citation.]" (*Hensel Phelps*, *supra,* 45 Cal.App.5th at p. 691.)

" 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id*., § 1639.) The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" (*id*., § 1644), controls judicial interpretation. (*Id*., § 1638.) Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning." (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 608; see *Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 752.)

In addition, "[o]n appeal from a judgment based on a statement of decision after a bench trial, we review the trial court's conclusions of law de novo and its findings of fact for substantial evidence. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) Under the deferential substantial evidence standard of review, we 'liberally construe[ ]' findings of fact 'to support the judgment and we consider the evidence in the light most

49

favorable to the prevailing party, drawing all reasonable inferences in support of the findings.' (*Ibid.*) 'We may not reweigh the evidence and are bound by the trial court's credibility determinations.' (*Estate of Young* (2008) 160 Cal.App.4th 62, 76.) Testimony believed by the trial court 'may be rejected only when it is inherently improbable or incredible, i.e., " 'unbelievable *per se*,' " physically impossible or " 'wholly unacceptable to reasonable minds.' " ' (*Oldham v. Kizer* (1991) 235 Cal.App.3d 1046, 1065.) ' "The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record." ' (*Estate of Young*, at p. 76.)" (*McPherson v. EF Intercultural Foundation, Inc.* (2020) 47 Cal.App.5th 243, 257 (*McPherson*).)

We review a trial court's ruling on a motion for summary adjudication de novo. (See *Benson v. Superior Court* (2010) 185 Cal.App.4th 1179, 1184–1185.) On appeal, we independently assess the correctness of the ruling, applying the same legal standard as the trial court to determine if there are genuine issues of material fact. (See, e.g., *AMN Healthcare, Inc. v. Aya Healthcare Services, Inc.* (2018) 28 Cal.App.5th 923, 934.)

## DISCUSSION

### 1. Introduction

To establish a claim for breach of contract, the District needed to demonstrate "(1) the existence of the contract, (2) [its] performance or excuse for nonperformance, (3) [Contractor's] breach, and (4) the resulting damages." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.) Many of the material facts were, as noted, undisputed. The central question for our consideration is whether the process Contractor used to develop its job order proposals constitutes a breach of the master

50

job order contracts—an issue as to which the parties fundamentally disagree.

Stated simply, Contractor asserts that once a job order proposal is approved and accepted by the District, Contractor is entitled to payment in full if it completes the detailed scope of work required under the job order. Because the job order is a firm, fixed-price, lump sum contract, the District cannot attack the agreed-upon price later, as it has purportedly done in this litigation, in the absence of fraud or mistake. The District, by contrast, claims it may recover damages for breach of the master job order contracts to the extent Contractor "overpriced" its job order proposals, its own acceptance of those proposals and the definition of a job order as firm, fixed-price, lump sum contract notwithstanding. The District relies primarily on audit provisions in the General Conditions that make reference to "adjustments" for "overpricing" or "overcharging" revealed by an audit.

The court adopted the District's position incrementally and it accepted the District's interpretation of the contractual and statutory provisions that relate to its "overpricing" theory. As we explain, we agree with the court's findings that Contractor breached the master job order contracts as to Phases I and II but we conclude that the court erred in granting the District's motions for summary adjudication because disputed issues of material fact exist concerning the District's damages. Further, and as to Phase III, we reject the court's interpretation of the applicable statutes and contractual provisions underlying the District's theory of liability.

## 2. Phases I and II

### 2.1. Relevant Contractual Provisions

The District's job order contracting process is governed in part by statute, as discussed, *ante*, and in part by District-prepared master job order contract documents that include a lengthy set of General Conditions. The contractual provisions at issue are contained in the General Conditions.

As already explained, the District and Contractor entered into a number of master job order contracts by which Contractor committed to perform work for the District as needed and under the terms and conditions set forth in the contract documents. When the District wanted Contractor to perform work under a master job order contract, it used the multi-step procedure outlined in the General Conditions.[45] First, the District notified Contractor in writing that work was necessary. (Art. 6.61.3.1.) Contractor was required to respond within one day and participate in a "joint scope meeting" with the District at the project site. The purpose of the meeting was to flesh out the details of the proposed project. (Art. 6.61.3.2.) After the detailed scope of work was determined, the District issued a request for proposal to Contractor. (Art. 6.61.3.3.)

Contractor was required to develop the job order proposal in the specific manner dictated by the job order contract documents. As noted, *ante*, the transparent job order pricing method, the use of pre-priced work units (i.e., a construction task catalog), and the application of the pricing formulas contained in

---

[45] We refer to the 2005 General Conditions here. Similar provisions are found in the 2007 General Conditions unless otherwise noted.

the General Conditions are critical components of the job order contracting method.[46] (Art. 6.61.3.4.) As noted, a job order proposal lists the materials and tasks Contractor projects may be needed to complete the detailed scope of work and calculates a proposed price for the job order project. And as conceived, the CTC pricing formula should apply to most line items. (§ 20919.1, subd. (*l*).) Ideally, Contractor would select most of its tasks and equipment from the construction task catalog and apply the CTC pricing formula in its job order proposal: the price of the catalog item multiplied by the number of units needed multiplied by Contractor's competitively bid adjustment factor. (Art. 6.61.3.4.1.) If Contractor identified, or the District requested, a task that was not included in the construction task catalog, Contractor was required to designate it as a non-prepriced item in its job order proposal. Contractor would also apply the NPP pricing formula: the cost of the item multiplied by the number of units needed plus a mark-up of five or 15 percent.[47] (Arts. 6.61.3.4.1, 6.61.3.4.3.)

 While Contractor assembled its job order proposal, the District was required (both by statute and under the General Conditions) to obtain an independent estimate for the detailed

---

[46] In most cases, a contractor would be required to exercise its professional judgment about the construction task catalog items to be used and the quantities that might be required for a specific project. A contractor is essentially preparing an estimate to perform the detailed scope of work. As to Phases I and II, however, the District told Contractor exactly what it wanted. No discretion on Contractor's part was required in the selection of items to be included in the job order proposal.

[47] The 2007 General Conditions allow for a mark-up of 15 percent.

scope of work.[48] If Contractor's price was not in line with the District's estimate—or if the District decided for any reason that it was not in its interest to proceed as Contractor proposed—the District could reject the job order proposal. (Art. 6.61.4.6.) If the District accepted the job order proposal, the job order was a firm, fixed-price, lump sum contract. (Arts. 1.25, 6.61.4.6; § 29019.1, subd. (d)[49].)

## 2.2. Breach of Contract

The court found in connection with the bench trial and the District's motions for summary adjudication that Contractor violated the pricing provisions of the master job order contracts with respect to its Phase I and II job order proposals. Contractor's attacks on these findings are unavailing.

### 2.2.1. Failure to comply with the pricing provisions of the master job order contracts constitutes a breach of contract.

As an initial matter, Contractor repeatedly emphasizes that job orders are defined by contract and statute as firm, fixed-

---

[48] Section 20919.11 provides, in pertinent part, "In order to prevent fraud, waste, and abuse, the [District] adopting job order contracting shall … : [¶] (a) Prepare for each individual job order developed under a job order contract an independent [District] estimate. The estimate will be prepared prior to the receipt of the contractor's offer to perform work [i.e., the job order proposal] and will be compared to the contractor's proposed price to determine the reasonableness of that price before issuance of any job order."

[49] A job order is "a firm, fixed price, lump-sum order issued by [LAUSD] to a job order contractor for a definite project scope of work as compiled from the catalog of construction tasks to be performed pursuant to a job order contract."

price, lump sum contracts and that it was entitled to be paid in full if it completed the detailed scope of work of the job order. It characterizes the District's claims as retroactive price adjustments to job orders that are not permissible in the absence of fraud or mistake, neither of which the District has pleaded. Contractor apparently misunderstands the basis of the District's breach of contract claims.

As discussed, *ante*, the method a contractor uses to develop and price its job order proposals is dictated by statute as well as the master job order contracts. The required pricing method is essential to the job contracting process: a proposal must generally use the pre-set prices found in the construction task catalog, list separately every line item and the corresponding quantity proposed, and apply the pricing formulas found in the General Conditions. These requirements, along with the other mechanisms discussed *ante*, are designed to protect the public from corruption, fraud, and waste of public funds. We see no reason that a contractor's failure to comply with these material contract provisions should not constitute a breach of the master job order contracts for which damages are recoverable. We therefore reject Contractor's general notion that completion of a detailed scope of work for a specific job order effectively immunizes it from liability for a breach of the master job order contracts.

### 2.2.2. Contractor improperly priced its Phase I job order proposals.

As discussed in detail, *ante*, the material facts concerning the District's Phase I breach of contract claims were largely undisputed at both the bench trial and in connection with the District's motion for summary adjudication. The undisputed

evidence showed that the District requested specific and identical quantities of kitchen equipment for the 29 schools at issue and directed Contractor to obtain the equipment from TriMark. Although the TriMark equipment was not found in the construction task catalog, Contractor did not use the NPP pricing formula in preparing its job order proposals. Instead, Contractor prepared the Phase I job order proposals for all the schools in an identical manner using a contorted version of the CTC pricing formula, i.e., it used fictional quantities of non-TriMark equipment found in the construction task catalog and it applied a 24 percent mark-up across the board, rather than applying its competitively bid adjustment factors. It was also undisputed that Contractor paid TriMark $170,777 per school for the required equipment and priced its job order proposals at $245,999 or $245,000. If Contractor had applied the NPP pricing formula, its job order proposals would have totaled $179,316. The court made identical findings on these issues in the bench trial and in its ruling on the District's motion for summary adjudication and Contractor asserts the same arguments as to both rulings.[50]

The facts just summarized establish that Contractor breached the master job order contracts in pricing its Phase I job order proposals. As we have said, the pricing formulas contained

---

[50] Contractor offers two additional arguments regarding the court's summary adjudication rulings. We address the court's damages award in section 2.3, *post*. We reject Contractor's argument that the court erred by not automatically admitting and relying upon the trial evidence at the summary adjudication stage because Contractor fails to explain how that purported error resulted in any prejudice to it. An appellant has the burden not only to show error but prejudice from that error. (See Cal. Const., art. VI, § 13 [judgment will not be reversed on appeal in the absence of prejudicial error].)

in the General Conditions are material contract terms and the undisputed facts establish that Contractor should have but did not use the NPP pricing formula in its Phase I job orders.

Contractor offers several reasons it should not be held liable for breaching the master job order contracts. First, Contractor insists that the court misconstrued the contracts and that the pricing methodology it used is permissible. Contractor asserts that in addition to the two pricing formulas we have discussed, there is a third pricing method called "closest to CTC." According to Contractor, if an item Contractor intended to use was not in the catalog, the closest-to-CTC pricing method allowed it to apply the CTC pricing formula, substituting items from the construction task catalog in its job order proposals that were "the next or closest line item."

Contractor repeatedly contends the court ignored uncontroverted evidence supporting the validity of the "closest-to-CTC" pricing method, citing testimony by District representatives Paul Metoyer and Judith Herbert and a provision found in one of the District's job order contracting training manuals. Specifically, Metoyer testified that "the decision was made by the Program to utilize the – what they were calling the book price, which is the one they did utilize. … Yes, the closest items in the book template is what the Program Manager decided to – that they wanted to use." And during Herbert's testimony, the following exchange occurred: "Q: In other words, if you are using closest to CTC, you are using the CTC. A: Correct. It needed to be something that was equivalent to what was being proposed or close to." Finally, Contractor cites a line in a job order contracting training manual which states, "It is appropriate to use tasks from the CTC that are similar in specification and price when the exact task cannot

57

be found." (The training manual is not part of the contract documents, however.)

Contractor offers this "extrinsic evidence" to clarify a purported ambiguity regarding the pricing provisions in the master job order contracts. "If a contract is ambiguous, parol evidence is admissible to aid interpretation. [Citation.] We may look at, among other things, course of dealings as a practical construction of the terms. And it is permissible to consider the meaning ascribed to language as a matter of custom and practice. [Citation.]" (*Dillingham-Ray Wilson v. City of Los Angeles* (2010) 182 Cal.App.4th 1396, 1404 (*Dillingham*).) We find it unnecessary, however, to consider whether the contracts are ambiguous. As the court noted, Contractor did not simply substitute a construction task catalog item for a similar TriMark item in its proposals. It also used fictional quantities—in several cases fractional quantities of indivisible items. And in some instances the "closest-to-CTC" items were not even similar—a bread dispenser from the catalog was substituted for a condiment organizer rack from TriMark, for instance. In short, even if a "like for like" item swap was permissible under the master job order contracts, that is not what Contractor actually did in preparing its job order proposals for Phase I. We have no difficulty concluding, as the trial court did, that Contractor's failure to use the NPP pricing formula constitutes a breach of contract.

As an alternative strategy, Contractor argues that the District is at least partially responsible for its improper use of the CTC pricing formula. As Contractor notes, the District itself concluded that it was improper to use the job order contracting process for the sole purpose of procuring equipment, as it did in

Phases I and II. Moreover, Contractor urges, the District provided confusing and conflicting directives. Contractor initially submitted multiple Phase I proposals using the NPP pricing formula for kitchen equipment sourced from Duray which, like the TriMark equipment, was not found in the construction task catalog. But the District rejected those proposals—proposals that used the very formula it now claims Contractor should have used in its Phase I job order proposals. The District then told Contractor to obtain the equipment from TriMark and to submit proposals that "mirrored" the Torres proposal. That proposal used the CTC pricing formula even though the TriMark equipment was not found in the construction task catalog.

There is ample evidence in the record pointing to mismanagement of the job order contracting process on the part of the District during the relevant time. Nevertheless, to the extent Contractor suggests that the doctrine of equitable estoppel should apply, we conclude the court's findings against Contractor at the bench trial on that point are supported by substantial evidence. " ' "The doctrine of equitable estoppel is founded on concepts of equity and fair dealing. It provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment. The elements of the doctrine are that (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." ' [Citation.] Although equitable estoppel is a well-accepted remedy among private parties, it has been applied

59

sparingly when the party sought to be estopped is a governmental entity. 'The government may be bound by an equitable estoppel in the same manner as a private party' [citation], but the doctrine is invoked only in 'those "exceptional cases" where "justice and right require" ' [citation]—that is, when 'the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel' [Citation.] In short, '[e]quitable estoppel "will not apply against a governmental body except in unusual instances when necessary to avoid grave injustice and when the result will not defeat a strong public policy." ' [Citation.]" (*Alameda, supra,* 9 Cal.5th at p. 1072.)

The court concluded that Contractor had not proven the third and fourth elements. Specifically, the court considered testimony by several Contractor representatives who stated that Charlene Franck told them to "mirror" the Torres proposal. Those representatives said they interpreted Franck's instruction to mean that they should use items from the construction task catalog and submit proposals that totaled $245,000. The court rejected their explanations: "There is no evidence that District representatives instructed [Contractor] to use a CTC adjustment factor or to use made-up quantities to increase the final price on the proposals by roughly $65,000 for each school. These were decisions that [Contractor's] executives made on their own and not in reasonable reliance on any direction given by Franck or any other District representative." We decline Contractor's invitation to reweigh the evidence and credit the evidence supporting its position. As we have said, with respect to the court's bench trial findings, our task is to determine whether

60

substantial evidence supports the court's factual findings[51]—not whether the evidence could support a conclusion in favor of Contractor.[52]

### 2.2.3. Contractor improperly priced its Phase II job order proposals.

Like Phase I, the material facts concerning the District's Phase II breach of contract claims are largely undisputed. As explained in detail, *ante*, the District requested specific quantities of kitchen equipment for the 27 schools at issue and directed Contractor to obtain the equipment from TriMark. The equipment needed varied to some extent from school to school but again, none of the equipment was found in the construction task catalog. This time, Contractor properly designated all the TriMark equipment as non-prepriced in its job order proposals and purported to apply the NPP pricing formula. But Contractor did not use the five or 15 percent mark-up figure authorized in

---

[51] Contractor did not assert its waiver or estoppel arguments in opposition to the motion for summary adjudication.

[52] Because we reject Contractor's argument regarding the validity of "closest to CTC" pricing, we need not address Contractor's additional argument that Metoyer was empowered to approve the use of "closest to CTC" pricing. We also decline to address Contractor's argument that the statutory definition of "proposal" does not create a private right of action because that argument was not raised below. (See, e.g., *Sander v. Superior Court* (2018) 26 Cal.App.5th 651, 670 [" 'It is axiomatic that arguments not raised in the trial court are forfeited on appeal.' "].)

the General Conditions for use in the NPP pricing formula.[53] Instead, Contractor either increased the price of each line item by 25 percent and applied no mark-up, or it used its actual cost and applied a mark-up of approximately 25 percent.[54] Neither of these pricing methods complies with the General Conditions.

Contractor's primary argument is that it did not breach the master job order contracts because the pricing it used (a 25 percent mark-up over its cost) was negotiated with the District. Contractor notes that although the contracts permit the use of non-prepriced items, such usage is limited to some extent—at least at the five or 15 percent mark-up provided. Article 6.61.3.4.3.7 of the 2005 General Conditions[55] provides, "After using a non-prepriced item on three separate Work orders, the unit price for the work item will be negotiated and fixed as a permanent pre-priced item, which will no longer require price justification." We agree with Contractor's interpretation of the contract in this regard and we address that issue, *post*, in connection with the court's adjudication of damages.

Nevertheless, at the bench trial, the court considered disputed evidence and found as a factual matter that the parties

---

[53] As noted, *ante*, some of the contracts were governed by the 2007 General Conditions, which permit a 15 percent mark-up on non-prepriced work.

[54] Because the equipment needed varied from school to school, the damages resulting from the Contractor's overpricing also vary from school to school. Contractor does not dispute the District's calculations of the difference between the prices it proposed and the prices that result from the proper application of the nonprepriced formula.

[55] Article 6.27.6 of the 2007 General Conditions contains a similar requirement.

did *not* negotiate a 25 percent mark-up for the Phase II TriMark equipment and substantial evidence supports that finding. As discussed, *ante*, Timothy Stone testified that the District's regional project manager, Paul Metoyer, agreed to a 25 percent mark-up over cost for the TriMark equipment needed for Phase II. Metoyer denied making such an agreement, however, and the court was entitled to credit whichever testimony it found to be more credible. (See *McPherson, supra,* 47 Cal.App.5th at p. 257 [noting testimony believed by the trial court may be rejected only when it is " 'unbelievable *per se*,' " physically impossible, or " 'wholly unacceptable to reasonable minds' "].)

Contractor argues, with respect to the summary adjudication ruling, that the court impermissibly weighed the evidence and improperly viewed the evidence in the light most favorable to the District by finding again that the parties had not negotiated a 25 percent mark-up over cost for Phase II. Specifically, Contractor points to Timothy Stone's declaration that he "participated personally in the negotiations for Phase II" and urges that Edwin Cartagena's internal email shows that District staff members negotiated a 25 percent mark-up with Contractor on the TriMark equipment for Phase II. At a minimum, Contractor urges, there is a dispute of material fact that precluded summary adjudication.

We tend to agree with the court's assessment of this evidence. Stone testified at trial that he and Metoyer agreed on a 25 percent mark-up for Phase II during a telephone call. Stone's subsequent declaration, which attempts to distance itself from that trial testimony by suggesting that "District employees" other than Metoyer negotiated the mark-up, contradicts his prior testimony and the court was free to conclude that it did not

63

create a triable issue of fact. (Cf. *Harris v. Thomas Dee Engineering Co., Inc.* (2021) 68 Cal.App.5th 594, 605 [observing a declaration that conflicts with prior testimony may be given little if any weight at the summary adjudication stage, particularly where the "deponent testifies regarding a factual matter within his or her personal knowledge and arguably contradicts the testimony in a declaration"].)[56]

In any event, even if we were to agree that there is a dispute of fact as to whether Contractor and the District negotiated an across-the-board mark-up of 25 percent for the Phase II TriMark equipment, it would be of no consequence because the master job order contracts do not permit such an agreement. The repeated use provisions required the parties to negotiate a fixed price for repeatedly used items not found in the construction task catalog. After that point, the item was to be treated similarly to the other items found in the catalog, i.e., Contractor was required to apply the CTC pricing formula using the negotiated price multiplied by the number of units needed and Contractor's applicable adjustment factor. Contractor's job order proposals in Phase II did not use the CTC pricing formula or apply Contractor's adjustment factors. Instead, Contractor either used the NPP pricing formula with a 25 percent mark-up, or it used no mark-up and inflated its line item cost by 25 percent, neither of which is authorized under the General Conditions. In short, Contractor contends the parties negotiated an agreement that fails to comply with the master job order

---

[56] Because we defer to the court's finding that Metoyer did not agree to the 25 percent mark-up, we need not address Contractor's additional argument that Metoyer had the authority to make that agreement.

64

contracts. Because such an agreement would be invalid, any dispute about the nature of the agreement is immaterial.

### 2.3. Damages

Although we agree with the court's conclusion that Contractor breached the master job order contracts in pricing its job order proposals in Phases I and II, we cannot say the same for the court's adjudication of damages. We agree with Contractor that the court misconstrued material terms of the master job order contracts. Further, our interpretation of the contractual pricing provisions reveals that triable issues of material fact exist on the issue of damages. The court therefore erred in summarily adjudicating the District's breach of contract claims as to Phases I and II.

The general rule regarding damages for a breach of contract is well settled. "Damages awarded to an injured party for breach of contract 'seek to approximate the agreed-upon performance.' (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515 (*Applied*).) The goal is to put the plaintiff 'in as good a position as he or she would have occupied' if the defendant had not breached the contract. (24 Williston on Contracts (4th ed. 2002) § 64:1, p. 7.) In other words, the plaintiff is entitled to damages that are equivalent to the benefit of the plaintiff's contractual bargain. (*Id.* at pp. 9–10; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 813, pp. 732–733; [Citation.].) [¶] The injured party's damages cannot, however, exceed what it would have received if the contract had been fully performed on both sides. (Civ. Code, § 3358.) This limitation of damages for breach of a contract 'serves to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of

their enterprise.' (*Applied, supra*, 7 Cal.4th at p. 515.)" (*Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist.* (2004) 34 Cal.4th 960, 967–968.)

As to Phases I and II, the District requested as damages for each school, and the court awarded, the difference between Contractor's job order proposal price and the job order proposal price calculated using the NPP pricing formula. As noted, *ante*, the General Conditions provide for either a five or 15 percent mark-up, depending on which version of the General Conditions governs the specific job order. That calculation of damages was appropriate for the bench trial, which involved only two schools. But the court's use of that same formula for all the remaining schools fails to recognize and apply a material term of the contracts and, moreover, results in an impermissible windfall to the District.

As we have already discussed, both the 2005 and 2007 General Conditions contain an NPP pricing formula that limits Contractor's mark-up on items not found in the construction task catalog to five or 15 percent.[57] Both sets of General Conditions also provide that a new, CTC-equivalent price will be negotiated after a non-prepriced item is used in three job orders. Article 6.61.3.4.3.7 of the 2005 General Conditions provides: "After using a non-prepriced item on three separate Work orders, the unit price for the work item will be negotiated and fixed as a permanent pre-priced item, which will no longer require price justification." And Article 6.27.6 of the 2007 General Conditions

---

[57] Article 6.61.3.4.3 of the 2005 General Conditions and Article 6.28.4.2 of the 2007 General Conditions, both quoted *ante* and referred to as the repeated use provision.

66

provides, in pertinent part: "After using a Non-Prepriced item on three separate Work orders, a base unit price, equivalent to the price of Work units contained in the Gordian Group Construction Task Catalog item, will be negotiated and treated as a CTC unit priced item that does not require further price justifications."

As discussed in the prior section, Contractor contended below (and still contends here) that the prices contained in its job order proposals were negotiated with and agreed to by the District. And as we have said, the court was entitled to credit the evidence offered by the District to the contrary and find as a factual matter that no negotiation took place and no agreement was reached. Nevertheless, the court was only permitted to award the District damages that reflected the benefit of the bargain between the parties. In other words, even if the court disbelieved Contractor's evidence about the negotiation it claimed took place, the court was still required to award damages in accordance with the contract terms, which required the parties to negotiate a fixed, CTC-equivalent price for repeatedly used, non-prepriced items.

Because the court found that no negotiations took place, it did not apply the repeated use provision and it awarded damages based on the application of the NPP pricing formula on all job orders at issue. This was error. As explained, *ante*, a contractor bids its adjustment factor based on the prices contained in the construction task catalog. And the construction task catalog is a key component of the job order contracting system, as it fixes the prices for work to be performed. Thus, the expectations of the parties at the outset of the contractual relationship were that Contractor would perform work at the prices set forth in the construction task catalog and would apply its competitively bid

67

adjustment factor to those items as required by the CTC pricing formula. Non-prepriced items were, according to the General Conditions, to be used "from time to time." Timothy Stone testified that, in his experience, non-prepriced were used "for odds and ends here and there." Given that Contractor's overhead costs were 16 percent on its work for the District, Contractor would lose money on a job that paid a five or even a 15 percent mark-up. Contractor did not anticipate that it would be asked to provide millions of dollars of equipment using the NPP pricing formula. And the District itself determined that its representatives misused the job order contracting process to procure the equipment in that manner. In sum, the wholesale use of the NPP pricing formula on all job orders for Phases I and II does not remotely reflect the bargain between the parties.

Taking into account the court's factual findings, we are left with a dispute of material fact that must be resolved before the District's damages can be determined. The parties should have, but did not, negotiate CTC-equivalent prices for the TriMark equipment procured in Phases I and II. (Art. 6.61.3.4.3.7 (2005), Art. 6.27.6 (2007).) On remand, a trier of fact must determine what the likely outcome of such negotiations—what we will call the "adjusted per-unit price" for the TriMark equipment procured by Contractor—would have been. We leave the nature and scope of that inquiry to the sound discretion of the court.

After the trier of fact sets the adjusted per-unit price for each item of TriMark equipment utilized in Phases I and II, the District's damages should be calculated in the following

manner:[58] For each job order at issue in the District's motions for summary adjudication regarding Phases I and II, an "adjusted job order price" for the kitchen equipment should be calculated using the CTC pricing formula and (a) the items of TriMark equipment procured by Contractor for the project, (b) the adjusted per-unit price for each item of equipment, as set by the trier of fact, (c) the quantity of each item procured by Contractor from TriMark, and (d) Contractor's applicable competitively bid adjustment factor. The District's damages, if any, are represented by the difference between the price it paid for the TriMark equipment (i.e., the total agreed-upon job order price for kitchen equipment) and the "adjusted job order price" for the TriMark equipment actually installed.[59]

## 2.4. Prejudgment Interest

Contractor also challenges the court's award of prejudgment interest on several grounds. In light of our conclusion that triable issues of material fact exist regarding the

---

[58] The General Conditions contemplate that the NPP pricing formula may be applied three times before a price adjustment is required. The damages awarded for Birmingham and Burroughs reflect two applications of the NPP pricing formula. One additional school may be chosen in Phase I and Phase II and the District's damages calculated using the NPP pricing formula and Contractor's cost rather than the adjusted per unit prices.

[59] Contractor's job order proposals contained items other than kitchen equipment, including but not limited to sales tax, freight, storage, staging, and installation. These additional items were not discussed by the parties on appeal. On remand, the court should determine whether any of these additional items should factor into the calculation of damages.

District's damages as to all but three job orders in each phase, we must also conclude that the court's award of prejudgment interest was erroneous as to all but three job orders in each phase.

The District sought and the court awarded prejudgment interest under Civil Code section 3287, subdivision (a). That section provides, "A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day, except when the debtor is prevented by law, or by the act of the creditor from paying the debt. This section is applicable to recovery of damages and interest from any debtor, including the state or any county, city, city and county, municipal corporation, public district, public agency, or any political subdivision of the state." " '[T]he court has no discretion, but must award prejudgment interest upon request, from the first day there exists both a breach and a liquidated claim.' " (*Warren v. Kia Motors America, Inc.* (2018) 30 Cal.App.5th 24, 43 (*Warren*).) Because the award of prejudgment interest involves the construction of provisions in the Civil Code, our review is de novo. (See *Crane v. R. R. Crane Investment Corp.* (2022) 82 Cal.App.5th 748, 756.)

The court found that the District's damages were calculable as of the date of the final retention payment to Contractor on each job order. "The amount of damages for which [Contractor] is liable may be calculated with precision: the District's damages consist of overbilling on [Contractor's] proposals to the District and that amount was reasonably calculable from the moment when the District in 2009 paid the bills that [Contractor]

70

submitted to the District."[60] The court's finding is correct as to three job orders in each phase. As to the remaining job orders, however, that finding is erroneous in light of our conclusion that there are triable issues of material fact regarding the District's claim for damages.

" ' " 'Damages are deemed certain or capable of being made certain within the provisions of subdivision (a) of [Civil Code] section 3287 where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable but where their dispute centers on the issue of liability giving rise to damage.' [Citations.]" [Citation.] Thus, " ' "[t]he test for recovery of prejudgment interest under [Civil Code] section 3287, subdivision (a) is whether *defendant* actually know[s] the amount owed or from reasonably available information could the defendant have computed that amount. [Citation.]" [Citations.] "The statute … does not authorize prejudgment interest where the amount of damage, as opposed to the determination of liability, 'depends upon a judicial determination based upon conflicting evidence and it is not ascertainable from truthful data supplied by the claimant to his debtor.' [Citations.]" [Citation.] Thus, *where the amount of damages cannot be resolved except by verdict or judgment,*

---

[60] The District withheld payments it owed to Contractor on unrelated job orders and the parties agreed that those monies would be credited against any recovery in this case. The court found that the District "should not receive prejudgment interest on that part of the judgment which is equal to the withheld funds that [the District] did not pay to [Contractor] and for the period of time that the withheld funds were not paid, i.e., through the date the judgment is signed … ."

*prejudgment interest is not appropriate.* [Citation.]' [Citation.]"
[Citations.]' [Citation.]" (*Warren, supra*, 30 Cal.App.5th at p. 44.)

As discussed, *ante*, in calculating the District's damages,
the court should only have applied the non-prepriced formula to
three job orders in each phase. Those damages were, as the court
found, easily calculable and therefore subject to an award of
prejudgment interest under Civil Code section 3287,
subdivision (a). As to the remaining job orders, however, damages
cannot be calculated until a trier of fact determines the adjusted
per unit prices to be used to calculate the District's damages, as
explained *ante*. The need for such a determination bars the
District's recovery of prejudgment interest.

## 3.    Phase III

Contractor repeatedly challenged the legal basis of the
District's breach of contract theory as to Phase III including, as
pertinent here, in its opposition to the District's motion in limine
to exclude evidence of Contractor's actual costs of performance,
its mid-trial request to offer evidence of its actual costs, and its
post-trial motions. We conclude that the court erred in granting
the District's motion in limine and in denying Contractor's post-
trial motions.

### 3.1.   Standard of Review

We generally review orders granting or denying a motion
for a new trial for an abuse of discretion. (See *Aguilar v. Atlantic
Richfield Co.* (2001) 25 Cal.4th 826, 859 (*Aguilar*).) We typically
review orders granting or denying a motion for judgment
notwithstanding the verdict for substantial evidence. (See
*Webb v. Special Electric Co., Inc.* (2016) 63 Cal.4th 167, 192.)
And, generally, we review an order granting a motion in limine

72

for an abuse of discretion. (See *Dillingham, supra*, 182 Cal.App.4th at p. 1403.) But "any determination underlying any order is scrutinized under the test appropriate to such determination." (*Aguilar*, at p. 859.) Thus, to the extent the court's pre- and post-trial rulings concern issues of law, including the construction of statutory or contractual terms, our review is de novo. (E.g., *id.*, at p. 860 [in appeal from order granting new trial, issues of law are reviewed de novo]; *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 284 [where JNOV ruling based on "interpretation of a statute and application of statutory language to the undisputed facts[,] [r]eview of such issues [is] de novo"]; *Dillingham*, at p. 1403 [" '[I]f the trial court's in limine ruling was based upon a misinterpretation of applicable law, an abuse of discretion has been shown.' "].)

### 3.2. Analysis

As noted, the court found in favor of Contractor as to the Birmingham and Burroughs Phase III job orders in connection with the bench trial. The District had attempted to prove that Contractor "overpriced" its job order proposals by showing that five specific line items (out of roughly 165 line items in total) were either unused on the projects or were used in lesser quantities than provided in Contractor's proposal. But Contractor argued *the District* determined the proposed job order price was reasonable when it accepted the job order proposals. Contractor had submitted transparent proposals that disclosed every line item, quantity, and price, and the District had the job estimates it obtained from an independent party. Under the contract terms, the District was required to (and did) assess the reasonableness of the proposed price at the time it was submitted and on that

73

basis accepted the job order proposals. According to Contractor, nothing in the master job order contracts or in the applicable statute (§ 20919.11) permitted the District to change its mind years later and claim that the agreed-upon prices were unreasonable.

In its statement of decision following the bench trial, the court seemed to agree with Contractor's point. "If the governing standard for 'reasonableness' is the price paid by the District, how is that reasonableness to be determined. The court's recollection is that the experts from both sides concluded that [Contractor's] proposal was within 20% of a reasonable estimate to accomplish the Phase III construction required by the [detailed scope of work] and proposal. It is unlikely that the court could conclude that individual line items were overpriced if the price for the entire remodeling project was reasonable."

The District, however, pursued the same line item theory at the jury trial. As discussed, *ante*, this time its experts analyzed all the line items in the job order proposals. And they opined, as they had at the bench trial, that the "reasonable value" of the work performed was far less than the price contained in Contractor's job order proposals. The result, according to the District, was "overpricing."

This theory of liability generally, and the interpretation of the term "reasonable" in particular, rest on an untenable construction of the applicable statutes and contractual provisions. Contractor repeatedly addressed the issue of "reasonableness" during the proceedings below and, specifically, addressed the issue in its opposition to the motion in limine discussed *ante* as well as its post-trial motions. Contractor also devotes a substantial portion of its appellate briefing to its

74

contention that the court misconstrued the contract in a manner that affected the entire proceeding.

We begin our analysis where the District begins—with "overpricing." The District grounds its analysis in audit provisions contained in the General Conditions. Article 6.55 of the 2005 General Conditions, titled "Right to Audit," provides: "The State Allocation Board ('SAB') and/or OWNER shall have the right to review, obtain, inspect, audit and copy all the written and electronically stored records of CONTRACTOR pertaining to the Contract and/or Work and any Claim in connection with any of the foregoing, and regarding all applicable laws and/or regulations pertaining to the Contract and/or Work, in any way. CONTRACTOR agrees to provide SAB and/or OWNER with copies of records in computer readable format as well as hard copies of all relevant information requested in writing within ten (10) days of the request. CONTRACTOR shall also permit SAB and/or OWNER access to all CONTRACTOR premises, within ten (10) days of a written request, during normal business hours, for the purpose of interviewing employees and inspecting and copying such books, records, accounts and other material which may be relevant to any dispute between OWNER and CONTRACTOR and/or any matter under investigation for purposes of determining compliance with this Contract and/or determining compliance with applicable laws, such as, but without limitation, Business and Professions Code § 7108.5, Public Contract Code §§ 4104, 4107, 4107.5, Title 2, Subgroup 11, California Code of Regulations §§ 1865.12, et seq. CONTRACTOR agrees to maintain such records and allow such audits for a period of up to four (4) years following the date the Notice of Completion is recorded. This provision applies equally to

75

electronic records of the CONTRACTOR, including any records under its possession, custody or control. The audits may be performed by employees of OWNER and/or by an outside representative engaged by the OWNER. CONTRACTOR records as referred to in this Contract shall include, without limitation, any and all information, materials and data of every kind and character, such as, but not limited to, records, books, papers, documents, subscriptions, recordings, agreements, purchase orders, leases, contracts, commitments, arrangements, notes, daily diaries, superintendent reports, drawings, receipts, vouchers, memoranda, shipping invoices and/or tickets, delivery tickets, bills of lading, cost reports, profit and loss statements, all information provided by CONTRACTOR to any insurance and/or surety company, and any other material and/or sources of information that may in OWNER['s] judgment have any bearing on or pertain to any matters, rights, duties or obligations under and/or covered by any Contract Document. Such records may also include written policies and/or procedures, time sheets, equipment and/or material inventories, payroll registers, payroll records, cancelled payroll checks, subcontract files (including proposals and/or bids of successful and unsuccessful bidders, bid recaps, etc.), original estimates, estimating worksheets, correspondence, Change Order/Change Order Proposal/ and/or Change Order request files (including documentation covering negotiated settlements), backcharge logs and supporting documentation, invoices and related payment documentation, general ledger entries detailing cash and trade discounts earned, insurance rebates and dividends, and any other CONTRACTOR records which may have a bearing on matters of interest to the OWNER in connection with the CONTRACTOR dealings with

the OWNER. CONTRACTOR shall require all of its payees (e.g., Subcontractors, suppliers, materialmen, employees, officers, directors and others) to comply with provisions of this Article 6.55 by expressly including the requirements hereof in all written contracts with all such payees. Such requirements are to include that these flow-down right to audit provisions shall be included by such payees in all of their contracts with their Subcontractors, sub-Subcontractors, materialmen, etc. *If an audit, inspection and/or examination under this Article 6.55 discloses overpricing or overcharges of any nature by the CONTRACTOR to OWNER in excess of one percent (1%) of the Total Contract Amount, then, in addition to all other OWNER rights and remedies, and in addition to making adjustments for the overcharges and/or overpricing, the reasonable actual cost of the OWNER audit, inspection, and/or examination shall be reimbursed to OWNER by CONTRACTOR.* Any OWNER assessments shall be made no later than ninety (90) days from the date that OWNER findings are presented to CONTRACTOR. The fact that a Claim, arbitration, and/or litigation under Article 16 is pending involving the OWNER, CONTRACTOR, and/or others, shall not in any way preclude, postpone, or impair, in any way, OWNER rights to proceed under this Article 6.55." (Italics added.)

The 2007 General Conditions include a similar audit provision in Article 6.21: "6.21.1 The State Allocation Board ('SAB') and/or OWNER shall have the right to review, obtain, inspect, audit and copy all the written and electronically stored records of CONTRACTOR pertaining to the Contract and/or Work, and any claim in connection with any of the foregoing, and regarding all Applicable Laws and/or regulations pertaining to the Contract and/or Work, in any way.

77

"6.21.2 CONTRACTOR, in executing this Contract, agrees without reservation to OWNER's right to audit. Should CONTRACTOR refuse to allow OWNER or its agents access to any records, or delay or inhibit OWNER or its agents from performing the audit or any portion of the audit, CONTRACTOR may be subject to an adverse evaluation and/or removal from the list of pre-qualified contractors.

"6.21.3 CONTRACTOR shall include the right to audit provisions, specifically providing the right of OWNER's representatives to examine their records, in the contracts of all subcontractors, insurance agents, material suppliers, or any other business entity providing goods and services.

"6.21.4 *If an audit, inspection and/or examination under this Article 6.21 discloses overpricing and/or overcharges of any nature by CONTRACTOR to OWNER then, in addition to all other OWNER rights, remedies and adjustments for the overcharges and/or overpricing, CONTRACTOR shall reimburse OWNER for all reasonable actual cost of OWNER['s] audit, legal services, inspection, and/or examination. The cost of the audit reimbursable to OWNER will be assessed and retained for all overpricing and/or overcharges by CONTRACTOR that are found to be in excess of $40,000.00.*

"6.21.5 Any OWNER assessments shall be made no later than ninety (90) days from the date that OWNER findings are presented to CONTRACTOR. The fact that a dispute, claim, arbitration, and/or litigation under Article 16 is pending involving OWNER, CONTRACTOR, and/or others shall not in any way preclude, postpone, or impair in any way OWNER rights to proceed under this Article 6.21[.]" (Italics added.)

78

The term "overpricing" is found only in these audit provisions and is not defined anywhere in the contract documents. Accordingly, we consider the usual meaning of the term: "to set too high a price on" or "charge too much for."[61] What is "too high" or "too much," however, cannot be considered in a vacuum. Instead, it must be evaluated with respect to what the contract and the statutes require. As already explained, the contract documents require Contractor to select items for its job order proposals from the construction task catalog (or to plainly identify items not found in the construction task catalog) and then properly apply the CTC or NPP pricing formulas. To the extent Contractor failed to comply with those requirements and the job order proposal price was higher than it would have been if Contractor had properly applied the pricing formulas, as was alleged with respect to the Phase I and II job order proposals, the result can reasonably—and objectively—be classified as "overpricing."

But the "overpricing" alleged with respect to Phase III is materially different from what is alleged with respect to Phases I and II, and it is based on subjective terms found in the statutory and contractual provisions. Section 20919.1, subdivision (*l*), states that a job order proposal should include "*appropriate* quantities" of items from the construction task catalog. (Italics added.) In addition, Article 6.61.3 of the 2005 General Conditions and Article 6.28.4.3 of the 2007 General Conditions state that a job order proposal should include "support documentation to

---

[61] (Merriam-Webster's Unabridged Dict. <https://unabridged.merriam-webster.com/unabridged/overprice> [as of Feb. 3, 2023], archived at <https://perma.cc/6JSN-VYDN>.)

indicate that adequate engineering and planning for the requirement have been done, and that the Work units and quantities proposed are *reasonable* for the tasks to be performed." (Art. 6.61.3.4.2 (2005), italics added.) With respect to the Phase III job orders, the District claims that "overpricing" occurs whenever a line item contained in Contractor's job order proposal is not used, or the specified quantity is not fully used, to complete the detailed scope of work for a project. In so arguing, the District equates "appropriate" and "reasonable" with "necessary" and "actually used."

We reject this interpretation of the applicable statutory and contractual terms. Neither "appropriate" nor "reasonable," can be construed to require such exactitude. "Appropriate" is defined as "correct or suitable for some purpose or situation," while "reasonable" means "being or remaining within the bounds of reason."[62] Neither of those terms supports a reading of the contract that requires Contractor to foresee with 100 percent accuracy what is needed to complete a detailed scope of work. Nor could it. Multiple witnesses, including one of the District's experts, testified that estimating the cost of a construction project is not an exact science and that an estimate is never a fully accurate prediction of what will actually be required to complete a project.

Furthermore, the contract documents and the applicable statute make clear that the "reasonableness" of a contractor's job

---

[62] (Merriam-Webster's Unabridged Dict. <https://unabridged.merriam-webster.com/unabridged/appropriate> [as of Feb. 3, 2023], archived at <https://perma.cc/CT54-EYUN>, <https://unabridged.merriam-webster.com/unabridged/reasonable> [as of Feb. 3, 2023], archived <https://perma.cc/JYJ3-NZXN>.)

order proposal is a discretionary assessment made by the District at the time it considers whether to accept the proposal. Section 20919.11 provides, in relation to the prevention of fraud and waste, that "[an independent] estimate will be prepared prior to the receipt of the contractor's offer to perform work and will be compared to the contractor's proposed price *to determine the reasonableness of that price before issuance of any job order*." (Italics added.) The 2005 General Conditions also confirm that the District makes that discretionary decision before accepting a job order proposal: "The OWNER will evaluate the entire proposal and proposed Work units and compare these with the OWNER's estimate of the scope of Work *to determine the reasonableness of approach, including the nature and number of Work units proposed. The OWNER will determine whether the CONTRACTOR's Proposal is in line with its own estimate*." (Art. 6.61.3.4.3.5, italics added.) Thus, as Contractor argued throughout these proceedings, it is the District that determines what is reasonable in the first instance and it necessarily follows that the District is bound by that determination once it has accepted a contractor's job order proposal.

As we have said, a contractor's failure to use the pricing formulas or its failure to properly designate items as non-prepriced tasks may result in an objectively overpriced job order proposal. Such conduct deprives the District of the transparent process it bargained for and weakens one of the essential statutory guardrails in the job order contracting procedure designed to protect public funds. But nothing in the contract documents or the statutes relating to job order contracting suggests that the District is permitted to determine that a job order proposal is reasonable, accept the proposal, and then

81

subsequently allege that a contractor breached the master job order contracts by proposing a price that was unreasonable, i.e., "overpriced." In the absence of fraud on the part of a contractor, the District's acceptance of a properly-developed job order proposal, based on its discretionary determination that the price is reasonable, is binding. Accordingly, Contractor and Sureties are entitled to judgment as a matter of law on the District's breach of contract claims as to Phase III. (Code Civ. Proc., § 629, subd. (c).)

## 4. Liability of the Sureties

As noted, *ante*, Continental and Safeco issued bonds guaranteeing Contractor's work under the eight master job order contracts at issue. Nevertheless, Sureties contend they should not be liable for damages relating to any of Contractor's conduct at issue in this litigation. We address their contentions in turn.

### 4.1. Legal Principles

"A surety is 'one who promises to answer for the debt, default, or miscarriage of another, or hypothecates property as security therefor.' (Civ. Code, § 2787.) A surety bond is a ' "written instrument executed by the principal and surety in which the surety agrees to answer for the debt, default, or miscarriage of the principal." ' [Citation.]" (*Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 38 (*Cates*).)

To evaluate Sureties' arguments, we look to the job order contracts and to the bonds. "It long has been settled in California that where a bond incorporates another contract by an express reference thereto, 'the bond and the contract should be read together and construed fairly and reasonably as a whole according to the intention of the parties.' [Citations.] To ascertain

82

the nature and extent of the liability to which the surety has bound itself, courts must 'examine the language of the undertaking by the light of the [construction] agreement, faithful performance of the terms of which it guarantees.' [Citations.] As a general rule, '[t]he obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal … .' (Civ. Code, § 2809.)" (*Cates, supra*, 21 Cal.4th at pp. 39–40.)

"Performance bonds, like all contracts of surety, are construed with reference to the same rules that govern interpretation of other types of contracts. [Citations.] To ascertain the nature and extent of [a surety's] liability, we look first to the express terms of the performance bond. [Citation.] Properly undertaken, construction of a performance bond ' "does not mean that words are to be distorted out of their natural meaning, or that, by implication, something can be read into the contract that it will not reasonably bear; but it means that the contract shall be fairly construed with a view to effect the object for which it was given and to accomplish the purpose for which it was designed." ' [Citations.]" (*Cates, supra*, 21 Cal.4th at p. 39.)

### 4.2. Analysis

#### 4.2.1. The bonds do not indemnify the District.

Sureties state their first argument as follows: "Turning both the Bonds and surety law upside down, the trial court found the Sureties liable for [the District's] conduct. This legal error prejudiced the Sureties, who had only issued Bonds concerning [Contractor's] performance—not [the District's]." As an initial matter, we note that the court made no such finding at any time during the proceedings and Sureties cite only generally to the

83

court's statement of decision following the bench trial in support of their argument. Thus, the foundation of their argument is dangerously unsound.

In any event, in a lengthy section purporting to develop this argument, Sureties cite a few blackletter surety law principles and quote the portions of the bonds that state, "[t]he condition of this obligation is that if the CONTRACTOR shall in a workmanlike manner promptly, competently, and faithfully perform all of the terms and conditions and provisions of the Contract, in strict conformity therewith, then the obligations under this bond shall be null and void … ." And they note, correctly, that "[t]he Bond language is key." Sureties then assert that if the District had followed its own guidelines for approving job order proposals, the District would only have accepted proposals that complied with the master job order contracts and it therefore would not have incurred any damages flowing from "overpayments."[63] Sureties contend, rightly, that they did not bond *the District's* errors, omissions, neglect, or mistakes.

As the language from the bonds reveal, Sureties bonded Contractor's "perform[ance] of *all* of the terms and conditions and provisions of the Contract, in strict conformity therewith." (Emphasis added.) And we have already explained how Contractor's failure to apply the non-prepriced formulas properly in its Phase I and II job order proposals caused damages to the District. To the extent Sureties are attempting to argue that the

---

[63] Sureties appear to use the term "overpayment" to refer to the difference between the agreed-upon price paid by the District and the price calculated using the contractually-mandated non-prepriced formulas.

District's negligence was a contributing or superseding cause of damages for breaches of its contracts with Contractor, which somehow absolves Sureties of liability for Contractor's actions, they have not sufficiently developed that assertion. They have therefore forfeited the point.[64] (See, e.g., *Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655–656 [noting matters not properly raised or that lack adequate legal discussion will be deemed forfeited].)

### 4.2.2. The District's payments to Contractor did not exonerate Sureties.

Sureties next argue that because the District's "overpayments" to Contractor were made knowingly, Sureties are exonerated. Specifically, Sureties note that several members of the District's staff identified irregularities in Contractor's job order pricing as early as June 2008. Nevertheless, those staff members and senior representatives from the District continued to approve job order proposals from and pay bills submitted by Contractor. Sureties contend the District's "intentional silence—while the alleged damages it was 'suffering' continued to mount up as [the District] kept paying [Contractor] amounts that [the District] did not believe were actually owed—exonerated the Sureties."

In support of this argument, Sureties assert that "[u]nder longstanding California law, an obligee's payments to which the

---

[64] Because we do not construe the bonds to immunize the District's purported negligence, we need not address Contractor's further argument that such a construction would be unlawful under Civil Code section 2782.

principal[65] had no contractual right are a material alteration of the surety agreement that exonerates a surety's obligation." (See, e.g., Civ. Code, § 2819 ["A surety is exonerated, except so far as he or she may be indemnified by the principal, if by any act of the creditor, without the consent of the surety the original obligation of the principal is altered in any respect, or the remedies or rights of the creditor against the principal, in respect thereto, in any way impaired or suspended. …"].) Sureties then urge that the District, "[b]y voluntarily making alleged overpayments, … improperly shifted risk onto the Sureties, materially altering the risk that the Sureties had guaranteed. This exonerated the Sureties as a matter of law."

Sureties cite several cases in support of this proposition, including *Pacific Coast Engineering Co. v. Detroit Fidelity & Surety Co.* (1931) 214 Cal. 384, 389–397 and *County of Glenn v. Jones* (1905) 146 Cal. 518, 520–521. Their reliance on these cases is inapt, however, because the cases discuss premature payments, not "overpayments," as Sureties have used that term. "[P]remature payments occur when money which is intended to be kept by one party until a specific milestone is reached, is instead released before that milestone, which is often completion of some phase of work. [Citations.]" (*Torres, supra*, 57 Cal.App.5th at p. 514.) Our Supreme Court has explained how premature payments to a contractor impact a surety's risk: "Owners and contractors generally structure their contracts to provide for installment payments to the contractor as the work progresses, typically as the work reaches specified stages of completion. [Citation.] 'This payment system adds incentive for

---

65 The District is the obligee; Contractor is the principal.

86

the contractor to complete the work and reduces the risk of nonperformance for the owner. A percentage of funds held until completion of all of the work is called retainage and is intended both to reduce the risk of nonperformance by the contractor and to assure the completion of the work in accordance with the contract terms.' [Citation.] Progress payments and retainage serve to reduce both the owner's and the surety's risk. [Citation.] [¶] Thus, if an owner avoids overpaying the contractor as the project progresses, then the owner should have funds available to apply toward completion of the project in the event of the contractor's default. Indeed, when the surety, pursuant to a bond, undertakes to complete the project itself or expends funds to enable another contractor to do so, the surety is entitled to reimbursement from the retainage. [Citation.]" (*Cates, supra,* 21 Cal.4th at pp. 55–56.)

The cases regarding premature payments do not readily apply here because the District's post-project-completion discovery that Contractor had not properly priced its job order proposals never placed Sureties at risk of needing to complete the job orders without sufficient financial resources. We therefore agree with our colleagues in Division Eight of this Court, who in similar circumstances to the present case saw "no similarity between an owner's payment of an inflated price contained in the contract documents, apparently made on the schedule set forth in those documents, and the payment of a proper sum in disregard of the payment schedule in the contract documents." (*Torres, supra*, 57 Cal.App.5th at p. 514.)

87

### 4.2.3. The District was not required to give Sureties notice.

Sureties also urge that the District's claims against them fail as a matter of law because the District failed to provide Sureties with notice of Contractor's breaches of contract. Again, we turn to the language of the bonds and the master job order contracts.

The bonds provide that "[w]henever Contractor/Principal is declared by [the District] to be in breach/default/deficient under the Contract and/or the Owner exercises its right to terminate the CONTRACTOR'S right to proceed, [the District] having given Notice to the CONTRACTOR and Surety as required by the contract, if any, the Surety shall do one or more of the following: [¶] 1. Promptly remedy, and/or start to remedy, the declared default/breach/deficiency …; and/or [¶] 2. Complete the Contract in accordance with its terms and conditions; and/or [¶] 3. Pay to the Owner an amount not less than one hundred percent (100%) of the Contract Amount … ." The court, as noted, determined no notice was required on these facts and we agree.

Sureties assert that because Article 1.63 defines "Work" to include Contractor's preparation of its job order proposals, Articles 15.5.10 and 15.5.12 required the District to give Sureties notice of Contractor's breach. It is unclear, however, whether Sureties contend they were entitled to notice prior to the filing of the complaint, or at the time of the contractual breaches.[66] It

---

[66] Sureties assert that the District should have given them notice of the breaches prior to filing the complaint, but also suggest they should have had "the opportunity to correct or mitigate any contracting

appears undisputed, however, that Sureties received no notice of the District's claims prior to the District's filing of the complaint.

In any event, Article 15.5.10 provides that if, in the opinion of the District, a contractor "fails to adhere to any provision of this Contract" then the District "shall give notice as required by Article 15.5.11[67] or Article 15.5.12, as applicable." Article 15.5.10 is broad and, in the abstract, could include Contractor's failure to follow pricing procedures. But notice to a surety is only required if the circumstances in Article 15.5.12 occur and here, they did not.

Article 15.5.12 provides, in pertinent part: "[B]efore [the District] can proceed under Articles 15.5.15 and/or 15.5.16, [the District] shall first send a written notice to CONTRACTOR and its performance bond surety … ." Articles 15.5.15 and 15.5.16, in turn, relate to the District's possible remedies in the event the contractor fails to perform. Article 15.5.16, which involves termination of the contractor's services, is not applicable here. That leaves only Article 15.5.15, which would require notice to the bond surety if the District chose to "make good such deficiencies … by whatever method [the District] deems most expedient with the costs and expenses thereof being deducted, and/or drawn down, and/or charged against the Contractor, the Contract funds, including retention, and/or the performance bond[.]" The impact of these provisions when construction work is ongoing is plain: Before the District can take over the construction work to remedy deficiencies by the contractor, it

issues—for example, by selling the TriMark equipment before it was installed, purchasing new equipment, or settling the nascent dispute."

[67] Article 15.5.11 concerns safety violations and is not applicable here.

must alert the bond surety so that the surety has the opportunity to correct the deficiencies. But here, where the contractor's deficiency does not involve the ongoing construction of a project and the District has taken no corrective action, Article 15.5.15 simply does not apply.

### 4.2.4. Sureties are liable for prejudgment interest.

Finally, Sureties argue that the District is not entitled to prejudgment interest as against Sureties because Sureties had no knowledge of the dispute or of facts that would have allowed them to calculate the debt owed by Contractor to the District. As discussed, *ante*, the bulk of the prejudgment interest awarded by the court was improper. As to the portion of that award that survives, Sureties' argument is not well taken because Sureties' liability is coextensive with and derivative of Contractor's liability. (Civ. Code, § 2807; 9 Miller & Starr, Cal. Real Estate (4th ed. 2022) § 32:97 ["Under state law, the liability of a surety generally is commensurate and coextensive with that of the principal, whether or not the surety is fully aware of the principal's obligations."].)

## DISPOSITION

The judgment is reversed. On remand, the court shall conduct further proceedings consistent with this opinion regarding damages and prejudgment interest to be awarded to Los Angeles Unified School District as to the breach of contract claims relating to Phase I and Phase II and presented in the District's motions for summary adjudication. The court shall enter a judgment in favor of FH Paschen/S.N. Nielsen, Inc., Continental Casualty Company, and Safeco Insurance Company of America on the breach of contract claims relating to Phase III.

In the interest of justice, all parties to bear their own costs on appeal.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


                                              LAVIN, J.

WE CONCUR:


    EDMON, P. J.


    RICHARDSON (ANNE K.), J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.